Metropolitan Edison Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.
Office of Consumer Advocate, Intervenor.

Argued June 2, 1981, before Judges ROGERS, BLATT, WILLIAMS, JR., CRAIG and MACPHAIL.

*John McN. Cramer,* with him *Thomas L. Allen, Reed, Smith, Shaw & McClay,* for petitioner.

*Lee E. Morrison,* Assistant Counsel, with him *Daniel P. Delaney,* Assistant Counsel, and *Joseph J. Malatesta, Jr.,* Chief Counsel, for respondent.

*Craig R. Burgraff,* Assistant Consumer Advocate, with him *Carol Karl,* Legal Assistant and *Peter Schannauer,* Legal Assistant, for intervenor.

OPINION BY JUDGE WILLIAMS, JR., November 18, 1981:

Metropolitan Edison Company (Met-Ed) has appealed from an order of the Pennsylvania Public Utility Commission (Commission) directing the company to refund to its ratepaying customers a total sum of $4,657,955.

On March 15, 1976, the Commission filed against Met-Ed a Complaint and Investigation Upon Commission Motion. The complaint averred that components of the company's fuel cost adjustment surcharge passed on or charged to its ratepayers may have been unjust, unreasonable or unlawful, in that the surcharge may have been used to recover from customers excessive and unjustifiable prices the company had paid to its fuel suppliers. The order instituting the complaint also directed that an investigation be made into the fairness, reasonableness and legality of the charges made and rates received by Met-Ed pursuant of the fuel cost surcharge.[1]

On January 19, 1977, the Commission amended and supplemented its original complaint to allege that

---

[1] The proceedings here in issue were instituted prior to the effective date of the "new" Public Utility Code, 66 Pa. C.S. §§101 *et seq.* That is, the proceedings were brought under the prior law, the Public Utility Law, Act of May 28, 1937, P.L. 1053, *as amended,* 66 P.S. §§1101 *et seq.*

Met-Ed had unjustifiably paid more than the contract price on eight specified contracts for the delivery of coal; and that, further, Met-Ed had accepted under those contracts coal that did not meet the British Thermal Unit (BTU) specifications of the contracts. The relief sought by the Commission's amended complaint was a refund to ratepayers of: (1) the amount Met-Ed paid in excess of the contract base prices and (2) the additional cost associated with the company's acceptance of BTU-deficient coal from its suppliers. The questioned contract payments and coal deliveries were made during the calendar year of 1974; and, it is the fuel cost adjustment surcharge for that same year which is here in issue.

Met-Ed responded to the amended complaint with an answer which asserted, as an affirmative defense, that the company had a right of managerial discretion in selecting suppliers, in administering its coal contracts, and in accepting the price demands of its coal suppliers. Met-Ed's answer also asserted that: (1) the prices it paid for the coal were just and reasonable; (2) the Commission's original complaint was defective; and (3) the fuel cost adjustment provision of the company's tariff, under which the increased cost of the coal had been passed on to ratepayers, was a "Commission-made rate" and thus not subject to retroactive alteration and refund.

Met-Ed also filed a motion to dismiss the original and amended complaints on the following grounds: (1) that both pleadings were vague and unspecific; and (2) that the refund action was barred by the statute of limitations. In addition, Met-Ed petitioned for a declaratory order granting the motion to dismiss or, in the alternative, an order denying that motion and certifying it for appeal. On June 6, 1977, the Administrative Law Judge denied the motion to

dismiss and the alternatively petitioned for relief, as well. On November 18, 1977, the Commission affirmed that decision.

Met-Ed next requested a preliminary ruling as to how the burden of proof would be allocated in the proceedings on the merits. On September 5, 1978, the Administrative Law Judge ruled that the utility had to bear the proof burden. That ruling, too, was affirmed by the Commission.

Between September 14 and November 15, 1978, fourteen days of evidentiary hearings were conducted. On October 25, 1979, after the filing of briefs by all parties, the Administrative Law Judge entered his Initial Decision. He found that Met-Ed had failed to exercise managerial prudence in the administration of its coal contracts with three specified coal brokers; and had, thereby, caused its ratepayers to pay unjust rates in 1974. The three named coal brokers were Crown Coal and Coke Company (Crown), Allegheny and Eastern Coal Company (Allegheny) and Kittanning-Freeport Coal Company (Kittanning). The Administrative Law Judge also ordered Met-Ed to refund to its ratepaying customers the total sum of $2,661,639, with interest.

Exceptions to the Initial Decision were filed by all parties. On May 23, 1980, the Commission entered an order whereby it agreed with the determination that the utility had failed to exercise managerial prudence in the administration of the three mentioned contracts and had caused its ratepayers to bear unjust and unreasonable rates under the 1974 fuel cost adjustment provision.[2] However, the Commission dis-

---

[2] As to the claim based on allegedly BTU-deficient coal, the Administrative Law Judge dismissed the claim for lack of sufficient evidence, in that regard, to support a refund. The Commission adopted that conclusion.

agreed with the Administrative Law Judge's calculation of the refund due: The Commission calculated the utility's total refund liability to be $4,657,955. From that order followed Met-Ed's appeal to this Court.

Before this Court, Met-Ed's threshold contention is that the fuel cost adjustment provision in its tariff represents a ''Commission-made rate'' and thus cannot be retroactively changed. As support for this argument Met-Ed relies on the decision of the Pennsylvania Supreme Court in *Cheltenham & Abington Sewerage Co. v. Pennsylvania Public Utility Commission,* 344 Pa. 366, 25 A.2d 334 (1942). In our view, that decision does not address the issue in the case at bar and, accordingly, does not support Met-Ed's contention.

It is true that in *Cheltenham & Abington Sewerage Co.* the Supreme Court reversed a Commission decision ordering reparations or refunds for certain years, even though the Commission had found the rates for those years to be unreasonable. However, the basis for the Court's reversal was that the rates for the years in question had been previously approved by the Commission itself. When the Supreme Court spoke of rates that were ''Commission-made,'' it was referring to rates stamped with antecedent Commission approval; it was such rates that were held to be immune from retroactive alteration. In the instant case there was no prior Commission proceeding or action giving antecedent approval of the specific surcharges collected by Met-Ed in 1974 pursuant to its fuel cost adjustment provision. Therefore, the concept of a ''Commission-made rate'' has no application to the present case; and, thus, Met-Ed could not validly expect that the surcharges in issue were insulated from retroactive modification by the Commission.

Met-Ed next seeks to defend its managerial decision to pay increased prices in 1974 for the contract coal obtained through the Crown, Allegheny, and Kittanning companies. Met-Ed does not dispute that prices actually paid to these brokers exceeded the prices originally contracted for. Moreover, the utility concedes in its Brief that the increased payments to the Crown and Allegheny companies, and most of those to Kittanning, were not justified under any contractual provision. Met-Ed asserts, however, that its decision to accede to the brokers' demands for the higher prices was sound business judgment in light of "the runaway coal market created by the Arab oil embargo." In that regard, Met-Ed further argues that when confronted by its brokers with demands for prices higher than the contract terms, it was faced with two options: (1) demand strict adherence to the contract terms, coupled with a threat of legal action; or (2) negotiate contract modifications. Met-Ed takes the position that its managerial decision to choose the latter option and accept the higher prices was the more prudent response under the circumstances, because legal actions were not deemed a practical remedy and might have imperiled the utility's capacity to serve its customers. According to Met-Ed, had it refused to renegotiate the contract prices it would have been forced to seek substitute coal in the at least equally expensive "spot market."

The Commission's authority to interfere in the internal management of a utility company is limited. See, e.g., Bell Telephone Co. of Pennsylvania v. Driscoll, 343 Pa. 109, 21 A.2d 912 (1941); Northern Pennsylvania Power Co. v. Pennsylvania Public Utility Commission, 333 Pa. 265, 5 A.2d 133 (1939); Coplay Cement Manufacturing Co. v. Public Service Commission, 271 Pa. 58, 114 A. 649 (1921). The Commission is not empowered to act as a super board of directors

for the public utility companies of this state. *Northern Pennsylvania Power Co., supra.* Concerning a utility company's right of self-management, our state Supreme Court in the *Coplay Cement* case said:

> [*T*]*he company manages its own affairs to the fullest extent consistent with the protection of the public's interest, and only as to such matters is the commission authorized to intervene, and then only for the special purposes mentioned in the act.* (Emphasis in original.)

271 Pa. at 62, 114 A. at 650.

It is also fundamental that the Commission has an ongoing duty to protect the public from unreasonable rates while insuring that utility companies are permitted to charge rates sufficient to cover their costs and provide a reasonable rate of return. *Commonwealth v. Duquesne Light Co.,* 469 Pa. 415, 366 A.2d 242 (1976). Recognizing the Commission's duty to the public and a utility's right of self-management, our courts adopted the further proposition that it is not within the province of the Commission to interfere with the management of a utility unless an abuse of discretion or arbitrary action by the utility has been shown. *Lower Chichester Township v. Pennsylvania Public Utility Commission,* 180 Pa. Superior Ct. 503, 511, 119 A.2d 674, 678 (1956); *Pittsburgh v. Pennsylvania Public Utility Commission,* 173 Pa. Superior Ct. 87, 92, 95 A.2d 555, 558 (1953); *see Pennsylvania R. R. v. Pennsylvania Public Utility Commission,* 396 Pa. 34, 40, 152 A.2d 422, 425 (1959); *Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission,* 17 Pa. Commonwealth Ct. 333, 339-40, 331 A.2d 572, 575 (1975). An obvious corollary of the above proposition is that if there has been an abuse of managerial discretion, and the public interest has been adversely affected thereby, then the Commission is empowered to intervene.

In the instant case, the Commission reviewed the evidence and concluded that Met-Ed had failed to exercise reasonable managerial prudence in the administration of its contracts with the Crown, Allegheny, and Kittanning companies. That conclusion was based on the Commission's finding that Met-Ed had unreasonably failed to enforce its contractual rights, by failing to limit the price increases to actual increases in the cost of coal production, which the contracts allowed for. Indeed, the evidence established that prior to making the excessive payments, Met-Ed made little, if any, meaningful effort to ascertain whether the price increases demanded by the above three companies were justified by the production costs of the coal. The Commission further found that as a result of Met-Ed's managerial imprudence, the utility's ratepayers were forced to pay, in 1974, unjust and unreasonable rates under Met-Ed's fuel cost adjustment clause. Our review of the record leads us to conclude that these Commission findings are supported by substantial evidence. Therefore, it is beyond the province of this Court to disturb those findings on appeal. *County of Chester v. Pennsylvania Public Utility Commission*, 47 Pa. Commonwealth Ct. 366, 408 A.2d 552 (1979); *Pennsylvania Public Utility Commission v. Department of Transportation*, 21 Pa. Commonwealth Ct. 415, 346 A.2d 376 (1975).

It was for the Commission to gauge the weight and credibility of the evidence adduced by Met-Ed to *justify* its nonadherence to the price terms of the coal contracts. That the Commission did not accept the excuses advanced by Met-Ed affords no basis for appellate relief. We may not conceive an independent judgment and substitute it for the judgment of the Commission; nor may we indulge in the processes of weighing evidence and resolving conflicting testimony.

*Johnstown-Pittsburgh Express, Inc. v. Pennsylvania Public Utility Commission,* 5 Pa. Commonwealth Ct. 521, 291 A.2d 545 (1972).

Met-Ed characterized its acceptance of the increased price demands as contractual "modifications." And, in that regard, Met-Ed directs our attention to Section 2-209 of the Uniform Commercial Code (UCC), which permits contracts for the sale of goods to be consentingly modified without consideration.[3] We must observe, however, that the legal duties of a public utility to its ratepayers are not coextensive with the UCC. The rights and powers conferred by the UCC do not reduce a utility's obligations under the public utility laws. In sum, the UCC does not create in a public utility a liberty to disregard the interests of its ratepaying customers. Thus, the power of contractual modification conferred by the UCC cannot be imprudently and unreasonably exercised by a utility to the unfair detriment of its ratepayers. For Met-Ed to characterize the price increases as "modifications" under the UCC resolves nothing. The fact remains that the evidence in this case supports the Commission's conclusion that Met-Ed abused its managerial discretion by agreeing to the "modifications."

With regard to Met-Ed's contract with Allegheny, the Commission determined that the utility had overpaid for 104,817 tons of coal received in 1974. Met-Ed disputes the Commission's use of the number of tons to compute the refund identified to that contract, asserting that the computation should have been based on no more than 85,000 tons. Met-Ed's argument is not based on the tonnage actually received during the

---

[3] Act of April 6, 1953, P.L. 3, §2-209, reenacted by Section 2 of the Act of October 2, 1959, P.L. 1023, formerly 12A P.S. §2-209, repealed by the Act of November 1, 1979, P.L. 255, No. 86. A similar provision is now found in 13 Pa. C. S. §2209.

calendar year 1974, but rather is based on the structure of its contract with Allegheny.

The Allegheny contract was for a five-year term. subdivided into five consecutive twelve month periods beginning September 1, 1973. During each twelve-month period Allegheny was to sell Met-Ed 85,000 tons of coal. Since the contract periods ran from September to September, deliveries during the calendar year 1974 related to two separate contract periods. Thus, deliveries during January through August 1974 were under the first contract period; deliveries during September through December 1974 were within the second contract period.

It is Met-Ed's contention that since Allegheny was not obligated under the contract to deliver more than 85,000 tons during any twelve-month period, that figure should have been the maximum tonnage the Commission allocated to 1974. Yet, Met-Ed conceded that during the calendar year 1974 it did purchase 104,817 tons of coal pursuant to the contract. That the *contract* allocated this tonnage to different periods does not alter the reality that it was all contract coal received during the calendar year 1974. Accordingly, we find no basis in Met-Ed's argument to disturb the Commission's determination of this issue.

Met-Ed also disputes the amount of overpayment computed by the Commission relative to the Kittanning contract. The utility asserts that the increased prices it paid to that company during the last four months of 1974 reflected the price terms of a *new* contract.

The original Kittanning contract had been for a term of one year beginning September 1, 1973. That contract was scheduled to expire on September 1, 1974. but was subject to renewal or extension. On July 24, 1974, Met-Ed wrote to Kittanning and pro-

posed extending the contract for another year. The only new terms proposed in the utility's letter were that the tonnage be increased and a specific mine source added. Met-Ed's proposal to extend the original contract expressly stated that: "*All other terms and conditions of [the original contract] will apply.*..." (Emphasis added.) Met-Ed's proposal of extension said absolutely nothing about changing the price terms. Kittanning accepted the extension proposal, on August 1, 1974.

The Commission determined that Met-Ed and Kittanning extended the price terms of their original contract to the new agreement that took effect on September 1, 1974. Accordingly, the Commission further concluded that the higher prices paid to Kittanning during the last four months of 1974 also exceeded existing contractual terms. The stated basis for the Commission's conclusion, as to the renewal of the original price terms, is a clause in the original Kittanning contract which declares that: "There are no understandings or agreements relative to the contract or to its subject matter that are not fully expressed herein." By virtue of Met-Ed's extension proposal, the integration clause in the original contract also continued as a term of the new agreement.

In the Commission's view, the entirety of the new Kittanning agreement consisted of the original contract as modified only by the accepted extension proposal. The express, written terms of the extension, which did not include a price change, and the renewed integration clause from the original contract, afford ample support for the Commission's conclusion.

Met-Ed also takes issue with the Commission's pre-hearing ruling that the utility had to bear the burden of proof in the proceedings before the Administrative Law Judge. This assignment of error

is based on Section 312 of the Public Utility Law,[4] which in pertinent part provided as follows:

> In any proceeding upon the motion of the commission, involving any *proposed* or *existing rate* of any public utility, or in any proceeding upon complaint involving any proposed increase in rates, the *burden of proof* to show that the rate involved is just and reasonable shall be upon the public utility. (Emphasis added.)

Since the proceedings below were on Commission motion, and involved rates charged pursuant to the utility's fuel cost adjustment clause, Met-Ed premises that under Section 312 it had the burden of proof only if the rates in issue were either *proposed* or *existing* as of the time the proceedings were instituted. To this premise Met-Ed adds the following assertion: because the questioned 1974 rates were no longer in force when proceedings were instituted in March 1976, the case involved *past* rates; and not rates that were either *proposed* or *existing*. Therefore, the utility concludes, the proceeding was not one in which it had the burden of proving that the rates in issue were just and reasonable.

Given the posture of the evidence in this case, we need not address the utility's burden-of-proof argument. Notwithstanding the ruling as to the proof burden, the Commission legal staff presented evidence, of its own, sufficient to support the determination that Met-Ed had abused its managerial discretion and thereby caused its customers to pay unjust and unreasonable rates. There was no dispute or contest that Met-Ed in 1974 had paid prices that exceeded the terms of its existing contracts with the Crown and Allegheny companies; nor was it disputed

---

[4] 66 P.S. §1152.

that the prices paid to the Kittanning company exceeded original contract terms. And, there was no question that these increased prices were translated into higher 1974 rates for Met-Ed customers, by mechanism of the utility's fuel cost adjustment provision.

The gravamen of the Commission's case was that Met-Ed had paid the higher prices through imprudent administration of its contracts with the named coal brokers. Central to the Commission's case was the contention that the utility did not compel the coal brokers to justify, contractually, the higher coal prices they demanded and received.

At the hearing on the merits before the Administrative Law Judge, the Commission legal staff presented three witnesses whose combined expertise encompassed the subjects of coal market conditions, utility coal procurement practices, and the administration of coal contracts. These expert witnesses had reviewed Met-Ed's procurement management in general, and in relation to the contracts here in question. These witnesses testified that, in their opinion, Met-Ed's coal procurement practices and contract administration were severely deficient. Two of the witnesses were experts in the field of utility coal procurement practices and contract administration. One of them testified that it was prudent, important, and standard for a utility to obtain justifying documentation from a coal supplier before paying increased prices. The other procurement witness stated that, based on his review of the transactions in question, Met-Ed had secured no documentation from the brokers to justify paying the higher prices.[5]

---

[5] The principal witness for Met-Ed, the person responsible for its 1974 coal purchases, could not recall the brokers having presented any substantiation of cost-of-production increases.

In our view, the direct evidence presented by the Commission legal staff, in conjunction with the undisputed elements of the case, rendered the burden-of-proof ruling moot. Even assuming, *arguendo,* that the proof burden should have been placed on the Commission staff to establish that unreasonable rates were charged, that burden was met.

Met-Ed also argues that the ordered refunds were barred by the "statute of limitations" contained in the Public Utility Law. The Commission's initial complaint was brought pursuant to Section 313(a) of the Public Utility Law,[6] which, in pertinent part, defined as follows the period of limitations for a Commission-ordered refund.

> [T]he commission shall have the power and authority to make an order requiring the public utility to refund the amount of any *excess paid by any patron,* in consequence of . . . unlawful collection, *within two years prior to the date of the filing of the complaint.* . . . (Emphasis added.)

On this issue, it is Met-Ed's contention that the Commission's original complaint, filed in March 1976, did not meet the requisite standards of particularity, and thus did not toll the two-year statute of limitations for the 1974 surcharges. We disagree.

At the time the original complaint was entered, the requisites of a complaint before the Commission were prescribed by Section 1001 of the Public Utility Law.[7] In pertinent part, that Section provided:

> The commission . . . may complain in writing, setting forth any *act or thing done* or omitted to be done by any public utility in violation, or *claimed violation,* of any law which

---

[6] 66 P.S. §1153.

[7] 66 P.S. §1391.

the commission has jurisdiction to administer. ... (Emphasis added.)

It is our conclusion that the Commission's original complaint sufficiently set forth the "act or thing done" by the utility in "claimed violation" of law. The complaint advised Met-Ed that the alleged conduct in issue was the utility's receipt of unjust and unreasonable rates, in that the utility had unjustifiably paid amounts in excess of its contract prices for fuel and had passed on the excessive costs to its ratepayers through the fuel cost adjustment surcharge. In addition, attached to and made a part of the complaint were written interrogatories that directed Met-Ed's attention to the utility's fuel delivery contracts in force during 1974. Therefore, we hold that the Commission's original complaint was of acceptable particularity and satisfied the requisites of Section 1001 of the Public Utility Law. Accordingly, we further held that the original complaint served to toll the statute of limitations, as to rates unlawfully collected during the two years prior to the filing date of the complaint, which was March 15, 1976.

Still with reference to the two-year "statute of limitations," Met-Ed observes that when the original complaint was filed the period of limitations had expired as to any excessive charges paid by ratepayers prior to March 15, 1974. From this, Met-Ed makes the following further assertion: that it was incumbent upon the Commission to show that all of the excessive charges which were to be ordered refunded had in fact been paid by the customers within two years prior to the filing of the original complaint. With this legal proposition we agree.

In our view, the two-year limitation fixed by Section 313(a) of the Public Utility Law is not a "pure" statute of limitations, but is rather a special limita-

tion on the Commission's substantive legal power to order refunds. A "pure" statute of limitations operates only to bar a remedy, and does not affect the substantive existence of a legal right or power. A special limitation, by contrast, is an integral, substantive element of the right or power in question; the right or power cannot exist in scope beyond the special limitation. *See Guy v. Stoecklein Baking Co.,* 133 Pa. Superior Ct. 38, 1 A.2d 839 (1938). By the clear terms of Section 313(a) of the Public Utility Law, the Commission has the "power and authority" to order refunds only as to excessive charges paid within two years preceding the filing of a complaint. Thus, this two-year period is a statutory *special limitation* fixing the scope of the Commission's power to order refunds. Correlatively, this special limitation also fixes the scope of a utility's liability for such refunds.

Regarding the statutory time limitation, the following statement was made by the Superior Court of Pennsylvania in *Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission,* 186 Pa. Superior Ct. 1, 24, 140 A.2d 114, 125 (1958):

> The grant of refunds is governed by section 313(a) of the Public Utility Law . . . and such refunds are limited to those *shown to be due within the two years preceding the complaint.* (Emphasis added.)

On the record presently before us, we cannot clearly ascertain whether or not the totality of the ordered refund, exclusive of interest, is based on surcharges paid by customers within the two-year period preceding the original complaint; that is, surcharges paid on or after March 15, 1974.[8] We cannot say that all

---

[8] Even if the two-year limitation were a "pure" statute of limitations, our case law points to the following conclusion: once

the refunds are ones *"shown to be due"* within the limitation period; the Commission has made no clear finding of fact on that point.[9] Accordingly, it is necessary for us to remand this case to the Commission for findings as to what extent the ordered refund is based on surcharges made or collected by the utility on or after March 15, 1974. However, to the extent that the ordered refund is based on surcharges made on or after that date, the Commission order is affirmed.

ORDER

AND NOW, the 18th day of November, 1981, the above case is hereby remanded to the Pennsylvania Public Utility Commission to make specific findings of fact as to what part of the ordered refund is based on surcharges imposed or collected by the Metropolitan Edison Company on or after March 15, 1974. To the extent the total refund here involved is based on surcharges imposed or collected on or after March 15, 1974, the Commission's order is affirmed.

---

a statute of limitations has been pleaded, the burden shifts to the opposing party to bring his claim within the prescribed limitation. *See, e.g., McPhilomy v. Lister,* 341 Pa. 250, 19 A.2d 143 (1941); *McCahan v. Smith,* 9 Pa. Superior Ct. 318 (1899).

[9] The arguments in the Brief of the Commission legal staff are no substitute for adequate findings of fact on this issue.