In re Ronald J. McKAY, t/a Brickyard Racquetball Associates; and Maralyn H. McKay, Debtors.

Jack R. BRAUN; Howard J. Berman and Barbara Berman, his wife; Constance Lauris; Howard Lauris; Gary E. Stout, Trustee for the Lauris Estate; Sanford M. Aderson, Administrator of the Estate of Kathryn A. Kincaid, Deceased; and Sandra Peterson, Plaintiffs,

v.

Ronald J. McKAY; and Maralyn H. McKay; Mary Reitmeyer, Trustee; and Victor Pribanic, Escrow Agent, Defendants.

Bankruptcy No. 88–1785.
Adv. No. 88–0450.

United States Bankruptcy Court,
W.D. Pennsylvania.

Feb. 21, 1990.

John M. Silvestri, Pittsburgh, Pa., for plaintiffs.

Mary Reitmeyer, Mary Reitmeyer, P.C., Pittsburgh, Pa., Chapter 7 Trustee.

Edward J. Osterman, Eddy & Osterman, Pittsburgh, Pa., for defendants.

Victor H. Pribanic, Pribanic & Pribanic, P.C., McKeesport, Pa., escrow agent.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

The Complaint in the above-captioned adversary action consists of six (6) counts, of which only Counts II and VI remain to be adjudicated. Count I was dismissed by Order of Court on the day of trial. Summary judgment had been entered previously in favor of Plaintiffs therein with respect to Counts III, IV, and V.

Count II of the Complaint has been brought by Howard and Barbara Berman ("Bermans"), who allege that Ronald McKay used, for his own purposes and without their permission, $30,000.00 which they had deposited with McKay and which was to be held in trust by him until such time as the limited partnership interests in a proposed venture known as Brickyard Racquetball Associates ("Brickyard") had been fully subscribed. The Bermans seek to have the debt arising therefrom declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(4).

McKay does not expressly deny that his actions were in violation of 11 U.S.C. § 523(a)(4). Rather, he argues that the Bermans' claim is barred by the applicable statute of limitation.[1]

Plaintiffs Constance Lauris, Howard Lauris, and Gary E. Stout, Trustee for the Lauris' Estate, ask in Count VI of the Complaint that this Court impose a constructive trust on their behalf upon Ronald McKay's interest in 29,233 shares of stock in O'Neil Village Personal Care Corporation ("O'Neil Village")[2], which McKay allegedly acquired as the result of his unauthorized use of $170,000.00 he held in trust for Constance Lauris.[3]

Curiously, the Bankruptcy Trustee does not actively oppose the creation of a constructive trust in the stock on behalf of the Laurises and Stout. Rather, the Trustee maintains that it should be imposed on only 76.3%—i.e. on only 22,304 shares—of the stock in O'Neil Village which McKay acquired as the result of his unauthorized use of the $170,000.00.

For reasons set forth below, judgment will be entered in favor of the Bermans with respect to Count II, and the debt owed to the Bermans by the Debtors will be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(4). With respect to Count VI, this Court will decline the invitation of the parties interested therein to impose a constructive trust in favor of the Laurises and Stout in the shares of stock in O'Neil Village held in the name of Ronald McKay, now titled by operation of bankruptcy law in the Trustee.

## COUNT II

### FACTS

### *BERMAN v. McKAY*

A Placement Memorandum concerning a proposed limited partnership in Brickyard,

---

1. The McKays also had raised the affirmative defense of accord and satisfaction. They have since *conceded* in their post-trial brief that this defense is not viable. (*See* Defendants' Post–Hearing Brief, p. 4.)

2. O'Neil Village Personal Care Corporation, t/d/b/a Glenshire Woods filed for protection under Chapter 11 of the Bankruptcy Code on May 6, 1988 at Bankruptcy Case No. 88–1273. By Memorandum Opinion and Order of Court dated June 24, 1988, the case was dismissed.

3. Plaintiffs Howard and Barbara Berman, Constance and Howard Lauris, Gary Stout, and Sanford Aderson originally had sought a declaration that this stock was not an asset of Debtors' bankruptcy estate as the result of three (3) Orders of Court issued by the Court of Common Pleas of Allegheny County, Pennsylvania, in April and May of 1988. Said Orders imposed

constructive trusts in the stock on behalf of the Bermans, the Laurises, and Aderson. In addition, the Laurises rely on a Stipulation executed on June of 1988 in which McKay assigned all of his right, title, and interest in the stock to them.

These plaintiffs have *conceded* in their post-trial brief that the Orders and Stipulation are avoidable by the Trustee as preferential transfers pursuant to 11 U.S.C. § 547(b). (*See* Plaintiff/Constructive Trust Beneficiaries Post–Trial Brief on Declaratory Judgment/Counterclaim Against Trustee, p. 4.)

The only issues remaining to be decided in Count VI are whether a constructive trust on behalf of the Laurises and Stout in the stock should be imposed by this Court and, if so, the extent to which it ought to be imposed on the stock in question.

a health spa and racquetball club, was prepared in May of 1981. Twenty-five (25) limited partnership units, costing $30,000.00 per unit, were being offered by Ronald McKay, the sole general partner of Brickyard. The Placement Memorandum provided that any funds for subscription units received prior to termination of the offering were to be kept in a segregated interest-bearing savings account until organization of the limited partnership.

On July 24, 1981, the Bermans purchased one (1) subscription unit in Brickyard and deposited $30,000.00 with Ronald McKay. On August 31, 1981, another subscriber named Phillips also purchased a subscription unit and deposited $30,000.00 with McKay.

The $30,000.00 which McKay received from the Bermans was not immediately deposited in a segregated interest-bearing account, as required by the subscription agreement. McKay, an attorney at the time, initially deposited the money on July 29, 1981 in a trustee's account in his name at Equibank. The money received from Phillips also was initially deposited in this account on August 12, 1981.

A Paine Webber interest-bearing account in the name of Brickyard was opened by McKay at Mellon Bank on August 4, 1981. Only $50,000.00 of the $60,000.00 initially deposited in the trustee's account was deposited in the Paine Webber account. Specifically, on August 4, 1981, McKay drew a check in the amount of $22,000.00 on the trustee's account and deposited it in the Paine Webber account. On August 12, 1981, McKay drew a second check in the amount of $28,000.00 on the trustee's account and deposited it in the Paine Webber account. These were the only deposits ever made into the Paine Webber account.

The Subscription Agreement provided that money derived from subscription units was to be released for use on the Brickyard project only if it was fully subscribed—i.e., twenty-five (25) units at $30,000.00 each had been sold. If it was not fully subscribed, subscribers were to receive upon demand their entire subscription plus interest. The project was not fully subscribed.

The only subscribers were the Bermans and Phillips.

The remaining $10,000.00 received from the Bermans and Phillips was never deposited into the Paine Webber account. It was used by McKay, without permission, for "project expenses" incurred by Brickyard.

In addition, the Paine Webber account showed a closing balance of $50,287.55 on August 28, 1981, and a closing balance of only $44.90 on September 30, 1982. All of the money which McKay withdrew from the Paine Webber account had also been used by McKay, without permission, for expenses connected with the Brickyard project.

On April 15, 1982, the Bermans demanded that McKay return their money with interest. McKay did not return their money. Review of the Paine Webber Statement of Account reveals that there were not sufficient funds remaining in the account as of that date to satisfy their demand.

On September 2, 1982, a judgment note in the amount of $30,000.00 plus interest from January 1, 1982 was executed by Ronald McKay on behalf of Brickyard in his capacity as general partner and was delivered to the Bermans.

On October 28, 1982, Ronald McKay and Maralyn McKay, his wife, executed a judgment note in their own names in the amount of $30,000.00 and delivered it to the Bermans. This second note represented the same obligation as the note executed on September 2, 1982, and was in addition to, not in replacement of, the first note.

On December 7, 1982, the Bermans caused judgment to be confessed against Ronald and Maralyn McKay in the Court of Common Pleas of Allegheny County, Pennsylvania, under the terms of the note of October 28, 1982.

## ANALYSIS

Defendants Ronald McKay and Maralyn McKay contend that the action brought against them by the Bermans in Count II is barred by the applicable statute of limitation. According to Defendants, the alleged

fraud or defalcation of which Ronald McKay is accused must have occurred between September of 1981, the scheduled date for termination of the limited partnership subscription period, and September 2, 1982, when Ronald McKay delivered on behalf of Brickyard the judgment note for $30,000.00 plus interest. Defendants maintain that the applicable statute of limitation had expired by the time this adversary action was commenced on October 28, 1988.

Defendants' contention is without merit. The claim by the Bermans is not time-barred.

■ 11 U.S.C. § 523, under which the claim in Count II has been brought, contains no statute of limitation for actions brought thereunder. Where the Bankruptcy Code is silent and no uniform bankruptcy rule is required, the rights of the parties are governed by underlying nonbankruptcy law. *Butner v. U.S.*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). The applicable statute of limitation for the claim in Count II is determined by Pennsylvania law. *In re Pascucci*, 90 B.R. 438, 442 (Bankr.C.D.Calif.1988) (applying California law).

Plaintiffs in Count II in essence are claiming that the debt owed to them by the McKays is nondischargeable because Ronald McKay defrauded them. Under Pennsylvania law, a claim for fraud which accrued between June 27, 1978 and February 18, 1983 is governed by the six-year statute of limitation at 42 Pa. C.S.A. § 5527(6) (Purdon's Supp.1981). *A.J. Cunningham Packing Corp. v. Congress Financial Corp.*, 792 F.2d 330, 333 (3rd Cir.1986).

Since the Bermans allege that the debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) and (a)(4), their claim in *not* time-barred *unless* the statute of limitation had expired on July 1, 1988, the date on which Debtors filed their Chapter 11 petition. *In re Pascucci, supra* at 442–43.

■ The statute of limitation in a fraud action begins to run from the time of the fraudulent act(s) complained of, unless such fraud has been actively concealed by the wrongdoer. *Turtzo v. Boyer*, 370 Pa.

526, 88 A.2d 884, 885 (1952). If the alleged fraud has been actively concealed, it is tolled until the fraud is discovered or might have been discovered had due diligence been exercised. *F.D.I.C. v. Ciaffoni*, 176 Pa.Super. 91, 107 A.2d 211, 213 (1954). Once the statute of limitation has been raised, it is incumbent upon the party bringing the action to demonstrate that it is timely. *Metropolitan Edison Co. v. Pennsylvania P.U.C.*, 62 Pa.Cmwlth. 460, 437 A.2d 76, 84 n. 8 (1981). Plaintiffs must show that reasonable efforts were made to protect their interests and must explain why they were unable to discover the operative facts for their cause of action sooner than they did. *Bickell v. Stein*, 291 Pa.Super. 145, 435 A.2d 610, 612 (1981).

A statute of limitation begins to run when a cause of action accrues, as determined by the occurrence of the *final* significant event necessary to make the claim suable. *Mack Trucks, Inc. v. Bendix–Westinghouse Automotive Air Brake Co.*, 372 F.2d 18, 20 (3rd Cir.1966) *cert. den'd*, 387 U.S. 930, 87 S.Ct. 2053, 18 L.Ed.2d 992 (1967) (citations omitted).

■ The fraud of which Ronald McKay is accused apparently began as early as August of 1981, when he failed to deposit the entire $30,000.00 (which the Bermans had deposited with him) into the Paine Webber account, and continued until sometime in July or August of 1982, when McKay made unauthorized use of the last of those funds. Since there is no evidence that McKay actively concealed his actions from the Bermans, the statute of limitation on their action in Count II began to run sometime in July or August of 1982.

The bankruptcy petition in this case was filed on July 1, 1988, which is less than six (6) years from the last action by McKay constituting the alleged fraud. Consequently, the claim in Count II is not barred by the applicable statute of limitation.

■ Debtor has not actively contested or argued the question of nondischargeability pursuant to 11 U.S.C. § 523 at the hearing or brief. However, he has not expressly conceded this point. As the decision is

clear, and in an effort to be complete, a brief analysis of this issue shall follow.

Section 523 of the Bankruptcy Code provides that a discharge granted under 11 U.S.C. § 727 does not apply to certain specified debts. 11 U.S.C. § 523(a)(4), for instance, provides in relevant part that:

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

. . . .

Since the dischargeability of a debt can significantly affect a debtor's ability to obtain a fresh start, the various exceptions to dischargeability enumerated in 11 U.S.C. § 523(a) must be strictly construed against the creditor and in favor of the debtor. *In re Ward,* 88 B.R. 727, 728 (Bankr.W.D.Pa. 1988). The creditor must prove each element of an exception to dischargeability by clear and convincing evidence. *In re Ward, supra* at 729.

In order for the debt at issue in this case to be nondischargeable pursuant to 11 U.S.C. § 523(a)(4), the Bermans must show that Ronald McKay: (1) was acting in a fiduciary capacity; and (2) committed fraud or defalcation in such a capacity. *In re McCormick,* 70 B.R. 49, 50 (Bankr.W.D.Pa. 1987).

A fiduciary or confidential relationship is not limited to any particular association of parties. It arises whenever one party occupies such a position as to inspire confidence in another that he will act in good faith for the other's interest. *Peoples First National Bank & Trust Co. v. Ratajski,* 399 Pa. 419, 160 A.2d 451, 454 (1960) (*quoting, Hamberg v. Barsky,* 355 Pa. 462, 50 A.2d 345, 346 (1947)). It may arise where the parties do not deal with one another on equal terms, either because of overmastering dominance on one side, weakness, or trust justifiably reposed in the other. *Id.* Where one party has gained the confidence of another and purports to act with the

other's interest in mind, he can take no advantage unto himself. *Hamberg, supra,* 50 A.2d at 346.

The evidence overwhelmingly establishes that Ronald McKay was acting in a fiduciary capacity with respect to the Bermans. The Bermans deposited $30,000.00 for a subscription unit in the proposed Brickyard project with the clear understanding that McKay would deposit the funds in a segregated interest-bearing account and would not apply the funds towards Brickyard until the project had been fully subscribed. Under the terms of the subscription agreement, McKay was required to return upon demand any subscriptions, along with accrued interest, in the event the project was not fully subscribed.

Generally, "defalcation" is a failure to account for money or property that has been entrusted to one. *In re Cowley,* 35 B.R. 526, 529 (Bankr.D.Kan.1983) (citations omitted).

Defendants McKay have admitted by listing said debt in the bankruptcy schedules that they are indebted to the Bermans. In addition, Ronald McKay admitted at trial he had received $30,000.00 from the Bermans and was unable to return it to them on demand because he had misapplied the money by using it without their permission. This constitutes defalcation under § 523(a)(4) of the Bankruptcy Code.

The Bermans are entitled to a finding that the debt owed to them by the McKays is not dischargeable pursuant to 11 U.S.C. § 523(a)(4).[4]

## COUNT VI

### FACTS

#### *LAURIS and STOUT v. McKAY*

Constance Lauris deposited $170,000.00 in cash with Ronald McKay on December 15, 1986, for the purpose of purchasing investment units in tax free securities. McKay was to purchase the securities and receive the interest thereon in his own

---

**4.** In light of this determination, it is not necessary for the Court to consider whether the debt

in question is also nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

name in order to preserve Constance Lauris' anonymity and to conceal her involvement in the transactions. McKay was to remit to her, in cash, all interest received. Constance Lauris, who at the time was involved in an acrimonious divorce from her husband, Howard Lauris, gave the money to McKay in order to conceal it from her husband and to keep it out of the marital estate.

McKay deposited the $170,000.00 that same day in an account in his own name at McKeesport National Bank. The account ostensibly was maintained to pay expenses incurred by O'Neil Village. The balance in the account at the time of the deposit was $561.28.

Also on December 15, 1986, Ronald McKay and Walter E. Manns executed a partnership agreement wherein they formed the O'Neil Interim Funding Group ("OIFG"). The partnership was formed to secure and provide interim equity capital funding for a personal care project under development by O'Neil Village. Walter Manns had a fifty-one percent (51%) interest in OIFG and McKay had a forty-nine percent (49%) interest.

The next day, on December 16, 1986, OIFG and the shareholders of O'Neil Village, William Deemer, Michael Egerer, and Ronald McKay, executed a loan agreement. OIFG agreed to provide a loan to the shareholders in an amount not to exceed $335,000.00 and to provide a letter of credit not to exceed $235,000.00 in order to enable O'Neil Village to close on a mortgage loan and for construction of the project. As partial security for the loan and resultant promissory note, the shareholders pledged all of their stock in O'Neil Village. In the event of default by the shareholders, OIFG could either sell the stock or assume ownership of it.

On December 17, 1986, McKay withdrew $165,000.00 from the account at McKeesport National Bank and purchased a cashier's check in that amount made payable to O'Neil Village. This amount constituted McKay's capital contribution to OIFG and was loaned, along with $170,000.00 contributed to OIFG by Walter Manns, to the shareholders of O'Neil Village pursuant to the loan agreement executed the day before.

That same day, on December 17, 1986, McKay also drew a check on the account at McKeesport National Bank in the amount of $5,000.00 and made payable to Richard A. Clark in order to purchase 5,000 shares of O'Neil Village stock from Clark.

The account at McKeesport National Bank also showed a deposit of $39,101.00 and a balance of $42,894.54 on December 17, 1986.

The shareholders of O'Neil Village eventually defaulted on the loan, whereupon OIFG elected to take title to the shares of stock which had been pledged as security for the loan. Pursuant to the terms of the OIFG partnership agreement, Walter Manns and his wife received 30,427 shares of O'Neil Village stock and Ronald McKay received 29,233 shares of the stock.

Debtors filed a voluntary petition under Chapter 11 of the Bankruptcy Code on July 1, 1988. The present adversary action was commenced on October 19, 1988.

## ANALYSIS

Plaintiffs Constance and Howard Lauris and Gary Stout, Trustee for the Lauris Trust Estate, ask this Court to impose a constructive trust on their behalf upon Ronald McKay's interest in 29,233 shares of stock in O'Neil Village which, they maintain, McKay acquired as the result of his unauthorized use of the money Constance Lauris deposited with him.

As a preliminary matter, the Court cannot help but notice the sudden cessation of any genuine adversarial relationship between these Plaintiffs and Debtors. In prior proceedings before this Court, they agreed upon very little. Thus, at first it came as a surprise when Ronald McKay seemed willing and eager to offer testimony which satisfied all of the legal requirements for the imposition of a constructive trust.

After further reflection, however, the logic to and for this change in position, indeed cooperation, becomes evident. The

underlying debt owed by Ronald McKay to Plaintiffs was previously determined to be nondischargeable. Were a constructive trust imposed on the stock in question, it could be used to satisfy, at least in part, that nondischargeable debt. Obviously, both Plaintiffs and Debtors would gain considerably from such an arrangement. This result would, however, be highly detrimental to Debtors' other creditors since the stock would not be available to satisfy their claims.

The reason for the Trustee's acquiescence in all of this is less obvious. The Trustee does not oppose the imposition of a constructive trust but, rather, maintains that it should be imposed on only 76.3% of the stock. Were the Trustee to prevail in this regard, little or nothing would remain to satisfy other creditors. The Trustee's position, if adopted, conceivably would leave enough in the estate to pay only administrative claims.

Plaintiff Constance Lauris was the client of Debtor Ronald McKay, who at the time was an attorney. On December 15, 1986, Plaintiff Constance Lauris secretly deposited $170,000.00 with McKay with instructions that McKay purchase tax-free securities in his own name and remit earnings accrued thereon to her. The details of the instructions and/or the conversation between Constance Lauris and McKay are unknown, as McKay invoked his Fifth Amendment privilege against self-incrimination and refused to state what advice he may have given her or what specific direction she gave him concerning such matters. It is not clear how Constance Lauris came to possess $170,000.00 in cash. It is clear, however, that these funds were part of the marital estate of Constance and Howard Lauris. The conclusion is inescapable that her intent was to conceal these funds from her husband and the Court having jurisdiction over her divorce proceedings. It is equally clear that she intended to prevent the funds from becoming part of the equitable distribution of the marital estate. Constance Lauris was engaged in wrongful (and perhaps illegal) activity with regard to the divorce action when she delivered the $170,000.00 to Ronald McKay.

■ Imposition of a constructive trust is to be determined according to state law. *Jaffke v. Dunham,* 352 U.S. 280, 281, 77 S.Ct. 307, 309, 1 L.Ed.2d 314 (1957); *In re Hurricane Elkhorn Coal Corp.,* 32 B.R. 737, 739 (W.D.Ky.1983).

■ A constructive trust (or trust *ex maleficio*) is a relation with respect to property which subjects the person in whom legal title to the property resides to an equitable duty to convey it to another on the ground that his acquisition of that property was wrongful and that he would be unjustly enriched if permitted to retain it. *Yohe v. Yohe,* 466 Pa. 405, 353 A.2d 417, 421 (1976) (citing *Restatement of Restitution,* § 160 (1936); *Denny v. Cavalieri,* 297 Pa.Super. 129, 443 A.2d 333, 335 (1982). A constructive trust, unlike an express or resulting trust, does not require that the parties specifically intended to create a trust. *Stauffer v. Stauffer,* 465 Pa. 558, 351 A.2d 236, 241 (1976).

There is no bright line test for determining whether the facts of a given case dictate that a constructive trust be imposed. The test is whether or not unjust enrichment would be avoided, *Id.; also, Denny v. Cavalieri, supra,* 443 A.2d at 335.

■ The presumption of right in an action to impose a constructive trust lies in favor of one in whom legal title is lodged. *Metzger v. Metzger,* 338 Pa. 564, 14 A.2d 285 (1940). The burden of establishing the existence of facts upon which a constructive trust may be imposed rests with the party seeking its imposition. *Murphy v. Landsburg,* 58 F.R.D. 165, 170 (E.D.Pa.), *aff'd,* 490 F.2d 319 (3rd Cir.1973), *cert. den'd,* 416 U.S. 939, 94 S.Ct. 1941, 40 L.Ed 2d 289 (1974).

■ This Court is frequently reminded of the longstanding principle that "courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity". *Local Loan Co. v. Hunt,* 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934). Two basic maxims that courts in equity have always applied are that a party coming into equity must have clean hands, *see, e.g., Monsanto v.*

*Rohm & Haas Co.,* 456 F.2d 592 (3rd Cir. 1972), *cert. den'd,* 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1972), *rehrg. den'd,* 409 U.S. 899, 93 S.Ct. 108, 34 L.Ed.2d 158 (1972), and one who seeks equity must do equity, *see e.g., Mazer v. Sargent Electric Co.,* 407 Pa. 169, 180 A.2d 63 (1962).

The Bankruptcy Trustee, by operation of bankruptcy law, has legal title to the shares in question. Imposition of a constructive trust would be inappropriate in light of the facts presented herein. If in fact this Bankruptcy Court is a court of equity, then clearly Plaintiff Constance Lauris has not come into it with clean hands. Moreover, Plaintiff Constance Lauris has not done equity and, accordingly, is not deserving of same. She entered into the transaction with the Debtor with improper motives. The facts and circumstances surrounding this unusual activity, with this unusually large sum of money, point to impropriety as opposed to propriety.

There appears to be no unjust enrichment to the Trustee, as in fact the Trustee can utilize these funds to pay other deserving creditors of the Debtor. This creditor, Constance Lauris, will not be substantially damaged, as her claim and her debt have been determined to be nondischargeable. Whereas the other unsecured creditors would not be able to approach the Debtor after bankruptcy, Constance and Howard Lauris can do so.

Mr. Lauris is also not damaged as a result of this decision, as he will be free to factor these funds into the equitable distribution, thereby giving Mrs. Lauris her share out of same while taking existing funds as his share. With this decision, the Court can do justice to the unprotected dischargeable unsecured creditors, while leaving the nondischargeable Constance Lauris claim in place. This clearly appears to be the equitable decision as it relates to the facts in question.

An appropriate Order will be issued.

## ORDER OF COURT

AND NOW at Pittsburgh in said District this 21st day of February, 1990, based upon the foregoing Memorandum Opinion of this same date, it is ORDERED, ADJUDGED and DECREED that judgment is entered with respect to Count II in favor of Plaintiffs Howard J. Berman and Barbara Berman against Defendants Ronald J. McKay and Maralyn H. McKay; and that the debt owed by said Defendants to said Plaintiffs is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

IT IS FURTHER ORDERED that judgment is entered with respect to Count VI in favor of Defendants Ronald J. McKay, Maralyn H. McKay, and Mary Reitmeyer, Trustee, and against Plaintiffs Howard Berman, Barbara Berman, Howard Lauris, Constance Lauris, Gary E. Stout, and Sanford Aderson; and that a constructive trust in the 29,233 shares of stock in O'Neil Village Personal Care Corporation in the name of Ronald J. McKay will not be imposed by this Court in favor of Plaintiffs Howard Lauris, Constance Lauris, and Gary E. Stout.