**INDIANAPOLIS POWER & LIGHT COMPANY, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 10, 1997.

Decided May 7, 1998.

---

1072

Walter Cohen, Harrisburg and Stanley Fickle, Indianapolis, IN, for petitioner.

Lawrence Barth, Harrisburg, for respondent.

**1.** We may reverse a PUC decision where petitioner demonstrates a violation of constitutional rights, an error of law or lack of substantial evidence to support the PUC's findings of fact. *W.C. McQuaide, Inc. v. Pennsylvania Pub. Util. Comm'n,* 137 Pa.Cmwlth. 282, 585 A.2d 1151, 1154 (1991).

**2.** "[The] retail sale of electricity is provided generally by public utilities under bundled rates reg-

Gregory Harvey and Thomas Gardsden, Philadelphia, for intervenor.

Before COLINS, President Judge, and McGINLEY, SMITH, FRIEDMAN, KELLEY, FLAHERTY and LEADBETTER, JJ.

COLINS, President Judge.

■ Before this Court is the appeal of Indianapolis Power & Light Company (IPL) from the decision of the Pennsylvania Public Utility Commission (PUC) granting PECO Energy's (PECO) application for the issuance of a qualified rate order to recover stranded-costs pursuant to the Electricity Generation Customer Choice and Competition Act (Competition Act), 66 Pa.C.S. §§ 2801–12. This case presents an issue of first impression: whether the provisions of the Competition Act allowing the recovery of stranded-costs violate the Commerce Clause of the United States Constitution. We hold that they do not.[1]

## I.

Historically, the functions of electric utilities fell into three broad categories: generation (creating electricity), transmission (moving electricity from the generating source to other areas of a utility's service area), and distribution (delivering electricity to consumers). These three functions were performed by a single, local utility in what was termed a "bundled" fashion. The local utility maintained a highly regulated monopoly over a designated service area, and consumers were charged rates set by a state regulatory agency for these "bundled" services.[2] This system of regulated monopolies providing "bundled" services developed because of the inability of a competition-driven market to serve the public welfare at the inception of the electric industry.[3]

ulated by the commission." 66 Pa.C.S. § 2802(13).

**3.** *See General Motors Corp. v. Tracy,* 519 U.S. 278, ——, 117 S.Ct. 811, 819, 136 L.Ed.2d 761 (1997) (discussing development of single, local franchises in gas industry and stating that electric industry suffered through "same evolution"). In discussing the development of the gas indus-

**1074** 

Recognizing the modern day feasibility of a competition-driven electric generation market, Governor Ridge signed the Competition Act at the end of 1996. The Competition Act "unbundled" the three traditional functions of electric utilities in Pennsylvania in order to stimulate competition in the area of generation. Following a brief phase-in period, all Pennsylvania residents will be able to purchase their electricity from various in-state and out-of-state power companies licensed by the Commonwealth. At the same time, local utilities will remain responsible for transmitting and distributing electricity generated by themselves and all other licensed electric companies. Transmission and distribution will remain highly regulated.

 Moving from a highly regulated industry to a market-driven industry will undoubtedly occasion some problems due to the local utilities' reliance on the continuation of regulated rates. Most notably, the former monopolies will be unable to recover substantial expenses and capital costs through market-determined prices. In anticipation of these transitional problems, the General Assembly included provisions in the Competition Act that allow the local electric utilities to recover their "stranded-costs." In essence, "stranded-costs" are the costs prudently incurred by the local utilities that will not be recoverable through market-determined prices, and that result from the utilities' reliance on the previous regulatory structure.[4]

The Act provides two basic mechanisms for utilities to recover stranded-costs. First, after PUC approval, utilities may recover stranded-costs through a "competition transition charge"[5] that is paid by "every customer accessing the transmission or distribution network ... to the electric distribution company in whose certificated territory that customer is located." 66 Pa.C.S. § 2808(a). In other words, PUC will determine the amount of stranded-costs a utility is entitled to, and then this amount will be recouped over the course of several years by surcharging the residents of the area in which the utility transmits and delivers electricity (i.e., those living in the area where the utility previously maintained a monopoly over generation). Second, utilities may apply to PUC for a qualified rate order whereby all or a portion of these future competition transition charges can be "securitized." 66 Pa.C.S. § 2812. This process converts the utility's entitlement to receive future transition charges from its customers into a current, fully vested property right that may be pledged or sold as security for the issuance of transition bonds.

---

try, which was analogous to the development of the electric industry, the *Tracy* court notes that:

> It seemed virtually an economic necessity for States to provide a single, local franchise with a business opportunity free of competition from any source, within or without the State, so long as the creation of exclusive franchises under state law could be balanced by regulation and the imposition of obligations to the consuming public upon the franchised retailers.

519 U.S. at ——, 117 S.Ct. at 820; *see also United Distribution Cos. v. FERC*, 88 F.3d 1105, 1122 n. 4 (D.C.Cir.1996) (discussing formation of natural monopolies in gas industry occasioned by high ratio of fixed costs to variable costs and how lack of competition allowed "a single firm [to] supply the service more cheaply than two firms could").

4. The Commission found that the existing utility cost structure contained four categories of costs that could become stranded. They are:

1) Regulatory assets (deferred taxes, post-retirement employee benefits, etc.);

2) Non-utility generation contracts (which could include contracts to purchase electricity from qualifying facilities under the Public Utilities Regulatory Policies Act of 1978);

3) Utility generation assets (primarily nuclear power plants); and

4) Nuclear decommissioning costs.

Pennsylvania Public Utility Commission, Report and Recommendation to the Governor and General Assembly on Electric Competition (Competition Report), Docket No. I–940032, p. 14 (July 3, 1996). *See also* 66 Pa C.S. § 2803 (defining "transition or stranded-costs").

5. Competitive transition charge is defined as:

> A nonbypassable charge applied to the bill of every customer accessing the transmission or distribution network which (charge) is designed to recover an electric utility's transition or stranded-costs as determined by the commission under Sections 2804 (relating to standards for restructuring of electric industry) and 2808 (relating to competitive transition charge).

66 Pa.C.S. § 2803.

Pursuant to the Competition Act, PECO applied for a qualified rate order requesting authorization to issue transition bonds in the amount of approximately $3.8 billion. After reviewing the evidence, PUC issued a qualified rate order allowing PECO to securitize approximately $1.1 billion of its future competition transition charges. IPL, an Indiana electric company, then filed a petition for review with this Court in which it claims that permitting PECO to recover its stranded-costs violates the Commerce Clause of the United States Constitution.

II.

■ The Commerce Clause is an affirmative grant of power to Congress allowing it "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. The effect that the Commerce Clause has on state powers is seen in the negative or dormant aspects of Congress's Commerce Clause power. "The negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby 'impedes free private trade in the national market place.'" *General Motors Corp. v. Tracy*, 519 U.S. 278, ——, 117 S.Ct. 811, 818, 136 L.Ed.2d 761 (1997) (quoting *Reeves, Inc. v. Stake*, 447 U.S. 429, 437, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980)) (citations omitted). In sum, since Congress has plenary power to regulate commerce among the states, states are prohibited from passing laws that discriminate against interstate commerce.

■ Conversely, the Commerce Clause permits Congress to empower states with the authority to act in a manner that absent its permission would violate the Commerce Clause. "It is indeed well settled that Congress may use its power under the Commerce Clause to '[confer] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy.'"

*New England Power Co. v. New Hampshire*, 455 U.S. 331, 339–40, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 44, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980)). For example, Congress could empower the states to regulate utilities in a manner that would discriminate against out-of-state energy companies.

■ Supreme Court Commerce Clause precedent is abundant, but there is no bright-line test to determine whether a statute violates the Commerce Clause. *See generally Tracy*, 519 U.S. at —— n. 8, 117 S.Ct. at 820 n. 8 (1997) (citing *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983) and discussing Court's departure from bright-line test in Commerce Clause examinations of cases dealing with electric utilities). Modern Commerce Clause jurisprudence, therefore, involves a case-by-case examination of whether the statute discriminates against interstate commerce.[6] Thus, we are admonished by the Supreme Court to examine the provisions of the Competition Act at issue here with both deference to Commerce Clause precedent and sensitivity to the unique factual circumstances surrounding the Competition Act.

III.

■ IPL seeks to have the stranded-cost provisions invalidated as unconstitutional, while permitting the rest of the statute to remain in effect. IPL's theory is that by permitting PECO to recover its stranded-costs, the Commonwealth is giving the company a huge financial advantage in the new electric generation market to the detriment of out-of-state electric utilities. To this end, IPL makes a bevy of arguments that these provisions violate the Commerce Clause's prohibition against state laws that discriminate against interstate commerce. Also, IPL argues that these provisions are severable from the Competition Act as a whole and

6. Our Commerce Clause jurisprudence is not so rigid as to be controlled by the form by which a State erects barriers to commerce. Rather our cases have eschewed formalism for a sensitive, case-by-case analysis of purposes and effects. As the Court declared over 50 years ago: The commerce clause forbids discrimination, whether forthright or ingenious. In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce. *West Lynn Creamery v. Healy*, 512 U.S. 186, 201, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994).

that competition may proceed absent the stranded-cost provisions. We believe that IPL's argument is fraught with contradiction and find that IPL has failed to carry the difficult burden of proving that the stranded-cost provisions violate the Commerce Clause of the United States Constitution. *In re Petition to Recall Reese*, 542 Pa. 114, 119, 665 A.2d 1162, 1164 (1995).

The logical starting point in any examination of an alleged violation of the Commerce Clause is Supreme Court precedent and the guidelines therein. The most obvious violation of the Commerce Clause is a tax on out-of-state products and goods for the purpose of favoring local industry. "The paradigmatic example of a law discriminating against interstate commerce is the protective tariff or customs duty, which taxes goods imported from other states, but does not tax similar products in State." *West Lynn Creamery v. Healy*, 512 U.S. 186, 193, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994). Since these protective tariffs are obviously unconstitutional, Commerce Clause precedent has been focused more on state statutes that surreptitiously attempt "to reap some of the benefits of tariffs by other means." *Id.*

The Supreme Court has been quick to strike down all classes of state statutes that discriminate against interstate commerce through surreptitious means. *See id.* (invalidating Massachusetts assessment statute because assessment was, in effect, tax making out-of-state milk more expensive); *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992) (striking down Alabama statute that imposed additional fee for disposal of hazardous waste generated outside state); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (voiding Hawaii tax exemption for liquor products uniquely indigenous to state); *Hunt v. Washington State*

*Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (nullifying North Carolina shipping requirement because it protected local industry from competition from superior out-of-state product); *Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964) (determining that Florida statute requiring company to purchase milk from local producers was unconstitutional); *Toomer v. Witsell*, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948) (voiding South Carolina law requiring shrimp boats to dock in local port and unload, pack and stamp fish caught off state's coast); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935) (invalidating New York regulation imposed on milk distributors to shield local producers from effects of out-of-state competition); *Guy v. Baltimore*, 100 U.S. 434, 25 L.Ed. 743 (1879) (nullifying Baltimore wharfage tax that exempted Maryland products); *Welton v. Missouri*, 91 U.S. 275, 23 L.Ed. 347 (1875) (striking down Missouri license requirement that only applied to persons dealing in out-of-state goods). However, in surveying Supreme Court precedent we have found no case that speaks directly to the issue presented in the instant appeal.[7] Nevertheless, we have discovered that in deciding these cases the Supreme Court has developed a modern Commerce Clause approach that focuses primarily on whether the state law would "in its practical operation work discrimination against interstate commerce." *West Lynn Creamery*, 512 U.S. at 201, 114 S.Ct. 2205.

After thoroughly reviewing Supreme Court Commerce Clause precedent, we conclude that the Competition Act does not implicate the Commerce Clause for three reasons. First, the Competition Act does not discriminate against interstate commerce and is unlike the state statutes that have been previ-

---

7. We, of course, realize that the absence of a case factually identical to the present case is by no means conclusive to the fact that the Competition Act does not violate the Commerce Clause. It is, however, highly illustrative of the novelty of Pennsylvania's Competition Act. The determining factor for us is not the inability to find a case directly on point, but the fact that all the statutes that were struck down by the Supreme Court involved the stifling of interstate commerce

through local favoritism in then currently competitive markets. The Competition Act, read in whole, invites competition into an industry that has been historically limited to state-regulated monopolies, and as such, it is so distinct from Commerce Clause precedent that we must find that it does not involve the Commerce Clause. To hold otherwise would expand Supreme Court precedent, which this Court has neither the power nor desire to do.

ously examined under the Commerce Clause by the Supreme Court. Second, the provisions of the Competition Act that are questioned as discriminatory (those that allow for the recovery of stranded-costs) are consistent with the traditional ability of states to regulate the retail sales of electricity and do not trigger the dormant aspects of the Commerce Clause. Third, the need for stranded-cost recovery is evidenced by their acceptance in other forums moving toward competition and the Commerce Clause should not be used as an impediment to Pennsylvania's experiment with competition.

## A.

The Competition Act, and specifically, the stranded-cost provisions contained in the act, do not implicate the Commerce Clause because they do not discriminate against interstate commerce and are strikingly unlike laws invalidated in prior Supreme Court decisions addressing the Commerce Clause. Traditional Commerce Clause inquiries involved state statutes that protected local commerce by burdening interstate commerce. The Competition Act is significantly unique because its practical effect is the promotion of competition in an industry that heretofore had none, and the stranded-cost provisions are merely an element of this planned move toward competition. In actuality, the Competition Act is the antithesis of a statute that discriminates against interstate commerce and does not touch on Commerce Clause concerns. We, therefore, believe that allowing the Competition Act to remain in its present form is consistent with the Supreme Court's Commerce Clause jurisprudence because the practical effect of the stranded-cost provisions, and of the Competition Act as a whole, is to facilitate interstate commerce.

IPL argues that the stranded-cost provisions are a surreptitious attempt to discriminate against interstate commerce because, although the Competition Act allows competition, the stranded-cost recovery will give PECO an unfair advantage in the newly formed electric generation market. According to IPL, stranded-cost recovery is tantamount to a huge subsidy that PECO can use to artificially lower its rates for generated electricity to the detriment of out-of-state electric companies.[8] To buttress its argument, IPL analogizes the present case to the Supreme Court's decision in *West Lynn Creamery*. For IPL to prevail on its Commerce Clause challenge, it first would have to establish that the Commerce Clause is implicated in this matter. To do so, IPL must show that the Competition Act and the stranded-cost provisions discriminate against interstate commerce by affording utilities like PECO an advantage in this newly competitive market. Since IPL has not convinced us that the Competition Act or the stranded-cost provisions afford any such advantage, we fail to see how the Competition Act has any detrimental effect on interstate commerce.

IPL attempts to establish discrimination against interstate commerce by improperly focusing solely on the stranded-cost provisions without according any significance to the Competition Act as a whole. In addition, IPL goes further by mischaracterizing the nature of stranded-cost recovery to support its alleged violation of the Commerce Clause. When this argument is examined closely, there are two striking problems that undermine IPL's contention: first, the practical

8. The characterization of the stranded-cost recoveries as subsidies may present us with another ground for disposing of this case, which we choose not to pursue here. Although, the Supreme Court has not directly addressed the issue of the constitutionality of state subsidies, it has "noted that 'direct subsidization of domestic industry does not ordinarily run afoul' of the negative Commerce Clause." *West Lynn Creamery*, 512 U.S. at 199 n. 15, 114 S.Ct. 2205 (quoting *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 278, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)); *see also West Lynn Creamery*, 512 U.S. at 211, 114 S.Ct. 2205 (stating "I would therefore allow a State to subsidize its domestic industry so long as it does so from nondiscriminatory taxes that go into the State's general revenue fund") (Scalia, J, concurring). The only difference between the stranded-cost recoveries and a direct subsidy is that the state does not involve itself in the collection process. It does, however, involve itself in the process of determining how much the utilities receive. This appears to be a minimal administrative difference that may make the stranded-cost recoveries permissible subsidies. Nevertheless, there are stronger justifications to uphold these provisions.

effect of the Competition Act is undeniably the promotion of interstate commerce; and second, the stranded-cost recoveries are not a fortuitous gift from the Commonwealth to PECO as IPL argues; they represent identifiable and limited reimbursements to which PECO is entitled.

 The purpose of the Competition Act is clear: to relinquish the local utilities' monopoly control over the generation of electricity and to invite competition in an effort to lower electric generation rates for the citizens of this Commonwealth. *See generally* 66 Pa.C.S. § 2802 (detailing impetus for, and objectives of, Competition Act). The act mandates the creation of "direct access by retail customers to the competitive market for the generation of electricity." 66 Pa.C.S. § 2802(12). In addition, the act "requires electric utilities to unbundle their rates and services and to provide open access over their transmission and distribution systems to allow competitive suppliers to generate and sell electricity directly to consumers." 66 Pa.C.S. § 2802(14). The Competition Act, therefore, seeks to foster interstate commerce. Any attempt to read the stranded-cost provisions in isolation plainly distorts this avowed goal.

Even assuming that our examination could focus solely on the stranded-cost provisions with no concern for the purpose of the act as a whole, IPL would still fail because its argument erroneously hinges on a convoluted mischaracterization of the stranded-cost provisions. IPL erroneously characterizes stranded-costs as nothing more than "subsidies to high cost Pennsylvania utilities." This is untrue. The stranded-cost provisions allow for an equitable transition into a competitive, general electric market, and the recovery of stranded-costs is governed by strict guidelines. These guidelines limit both the amount of recovery and the time period in which the costs may be recovered. 66 Pa. C.S. § 2808(b), (c). Moreover, the recoveries are limited to costs "which traditionally would be recoverable under a regulated environment" and are subject to PUC's determination that it is "just and reasonable to recover [these costs] from ratepayers." 66 Pa. C.S. §§ 2803, 2804(13). In sum, even if we

looked no further than the stranded-cost provisions, we would find nothing to implicate the Commerce Clause. The stranded-cost recoveries are better characterized as restitution intended to place PECO where it would have been had regulation continued, rather than as subsidies intended to place PECO at an advantage.

It is further illustrative of the lack of the applicability of the Commerce Clause to our examination here that the precedent most heavily relied on by IPL is factually dissimilar from the case at bar. IPL relies on *West Lynn Creamery* as the Supreme Court precedent most analogous to the issue presented in this appeal, but we are not convinced that *West Lynn Creamery* is dispositive. *West Lynn Creamery* involved a Massachusetts pricing order, the admitted purpose of which was to preserve the local dairy industry. The pricing order subjected all fluid milk sold by dealers to Massachusetts retailers to an assessment. Although about two thirds of the milk was produced by out-of-state dairy farmers, the entire assessment was distributed to Massachusetts dairy farmers. The Supreme Court held that the pricing order violated the Commerce Clause "because its *avowed purpose* and its *undisputed effect* are to enable higher cost Massachusetts dairy farmers to compete with lower cost dairy farmers in other states." *West Lynn Creamery*, 512 U.S. at 194, 114 S.Ct. 2205 (emphasis added).

*West Lynn Creamery* is distinguishable from the present case on many grounds, the most obvious of which is the difference between the purpose of Massachusetts pricing order and the purpose of the Competition Act. The pricing order's sole objective was to save the financially distressed local dairy industry by shielding it from the rigors of interstate competition. In *West Lynn Creamery*, the Court concluded that this was "the hallmark of the economic protectionism that the Commerce Clause prohibits." *Id.* at 205, 114 S.Ct. 2205. Conversely, the Competition Act's *avowed purpose* is to promote competition and interstate commerce by opening the electric generation market. In this regard, it is difficult for us to comprehend how the stranded-cost provisions, which

facilitate this move toward more interstate commerce, are like the pricing order in *West Lynn Creamery*.

Moreover, the pricing order in *West Lynn Creamery* and the Competition Act are notably different in other aspects as well. The proceeds from premium payments in *West Lynn Creamery* were collected from both out-of-state and in-state retailers and dealers. Also, the premium payments were not limited in their duration, nor were they in any way related to a history of state regulation of the dairy industry. They were nothing more than gratuitous payments to assist a failing industry, which in effect discriminated against interstate commerce.

In the present case, the stranded-cost provisions of the Competition Act represent a careful and detailed part of Pennsylvania's move toward a competitive electric generation market. As stated previously, these stranded-costs must be recovered within a certain time frame, and they are limited to the sums local utilities spent prudently in reliance on the continuation of a regulated market. *See* 66 Pa.C.S. § 2808(b), (c). They are paid strictly by the citizens of the Commonwealth of Pennsylvania to Pennsylvania utilities, and have no direct effect on out-of-state entities. In addition, these payments are not gratuitous, but represent compensation for the investments made by utilities that will not be recouped by market-determined pricing. Most importantly, the *effect* of the stranded-cost provisions, as a component of the Competition Act, is the promotion of interstate commerce.

To summarize, the Competition Act, and the stranded-cost provisions contained therein, do not involve the Commerce Clause because they do not discriminate against interstate commerce. Allowing the act to remain as enacted by the General Assembly is consistent with Supreme Court precedent because the practical effect of the act is to promote competition. The stranded-cost provisions, which are an integral part of Pennsylvania's plan to open its electric markets to interstate competition, cannot be examined outside of the context of the entire act. The provisions limit stranded-cost recoveries both in terms of amounts and dura-

tion, and afford no unfair advantage to Pennsylvania utilities in the new electric generation market.

## B.

IPL's argument that the stranded-cost provisions violate the Commerce Clause is also undermined by the fact that these provisions are consistent with Pennsylvania's right to regulate the local incidents of public utilities, most notably, the rates charged by local utilities to consumers within the state. The transition charges are nothing more than a different manifestation of the previously regulated rates. Had Pennsylvania continued the system in effect prior to the Competition Act, PUC would have allowed PECO to recover these costs through the rates it charged for its "bundled" services without labeling them transition charges. The stranded-cost provisions are simply a novel way to accommodate the need for recovery of these costs consistent with traditional state regulation.

Historically, states have regulated the rates charged by local utilities to their instate customers, and Congress has never disturbed the states' right to do so even though it has assumed power over some other areas of utility regulation. Moreover, if Congress has spoken directly to the issue of the states' power over local utilities, it appears to have apportioned to the states the right to regulate these utilities in local respects. Thus, the stranded-cost provisions do not implicate the dormant aspects of the Commerce Clause because states have traditionally regulated in this area, and the evidence seems to indicate that Congress has apportioned this right to the states.

The gas and electric industries shared a similar fate at their inception in that it became an economic necessity for states to permit local monopolies in order for these industries to remain profitable. *Tracy*, 519 U.S. at ——, 117 S.Ct. at 819–20. The monopoly power of these franchises was "balanced by regulation and the imposition of obligations to the consuming public upon the franchised retailers" at the state level. *Tracy*, 519 U.S. at ——, 117 S.Ct. at 820. Es-

sentially, utilities were principally an intrastate concern at this point. This began to change in the early twentieth century, when the natural gas industry, and later the electric industry, developed into more interstate concerns.

As a corollary, the Supreme Court eventually confronted the issue of whether state regulation of the sale of natural gas in interstate commerce violated the Commerce Clause. Through its disposition of several cases, the Supreme Court devised a bright-line test to determine whether a state regulation of natural gas sales violated the Commerce Clause. *See generally Missouri v. Kansas Gas Co.*, 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027 (1924) (holding that attempt by state to fix rates chargeable in sale of natural gas to distributor in another state is direct burden on interstate commerce); *Pub. Util. Comm'n for Kansas v. Landon*, 249 U.S. 236, 39 S.Ct. 268, 63 L.Ed. 577 (1919) (finding that piping natural gas from one state to another is interstate commerce, but retail sale of same natural gas is not); *cf. Pennsylvania Gas Co. v. Pub. Serv. Comm'n of New York*, 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434 (1920) (deciding that even though natural gas sold from company in one state directly to consumers in another state is interstate commerce, state can regulate these sales in absence of contrary Congressional regulation). The Supreme Court proceeded with the notion that wholesale transactions of natural gas had a direct effect on interstate commerce, whereas retail sales had only an indirect effect on interstate commerce. *Arkansas*, 461 U.S. at 378, 103 S.Ct. 1905. As a result, a general rule emerged that state regulation involving wholesale transactions of natural gas violated the Commerce Clause, while state regulation of retail sales did not. *Id.*

The wholesale-retail distinction was adopted in the context of the electric industry by the Supreme Court's decision in *Pub.*

*Util. Comm'n of Rhode Island v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549 (1927). In *Attleboro*, the Supreme Court addressed the issue of whether a state regulatory commission could regulate the rates that a local utility charged in selling its electric current to an out-of-state distributor. The Court held that the state's attempt to regulate the wholesale transaction "imposed a 'direct' rather than an 'indirect' burden on interstate commerce, and as such, the regulation violated the Commerce Clause." *Arkansas*, 461 U.S. at 378–79, 103 S.Ct. 1905.[9]

The *Attleboro* decision sparked the creation by Congress of what is today the Federal Energy Regulatory Commission (FERC) and the establishment of federal regulations over wholesale transactions of gas and electricity. *Arkansas*, 461 U.S. at 378–79, 103 S.Ct. 1905. These regulations were first seen in the Federal Power Act of 1935 (FPA), 16 U.S.C. §§ 791a–828c, and subsequently in the Natural Gas Act of 1938 (NGA), 15 U.S.C. §§ 717–717z (1997). *Arkansas*, 461 U.S. at 378–79, 103 S.Ct. 1905. "[T]he main purpose of this legislation was to 'fill the gap' created by *Attleboro* and its predecessors" in setting guidelines for federal and state regulation of electric and natural gas utilities. *Id.* at 379, 103 S.Ct. 1905. Congress assumed some regulatory authority through this legislation, but in no way impinged on the states' authority to regulate utilities at the local level. In fact, Congress was careful to leave intact the states' ability to regulate the most local aspects of the industry, which would necessarily include setting rates for local consumers.

The Supreme Court had occasion to discuss the care that Congress took not to disturb the state regulation of electric utilities at the local level in *Connecticut Light & Power v. Fed. Power Comm'n*, 324 U.S. 515, 65 S.Ct. 749, 89 L.Ed. 1150 (1945). *Connecticut Light* involved an order by the Federal

---

9. The *Arkansas* Court went on to note in deciding that case, that the wholesale-retail distinction was no longer workable and applied a test more in line with the general trend in the Court's modern Commerce Clause jurisprudence. The Court stated that this modern approach looked "in every case to the nature of the state regula-

tion involved, the objective of the state, and the effect of the regulation upon the national interest in the commerce." 461 U.S. at 390, 103 S.Ct. 1905 (1983) (citing *Illinois Natural Gas Co. v. Cent. Illinois Pub. Serv. Co.*, 314 U.S. 498, 505, 62 S.Ct. 384, 86 L.Ed. 371 (1942)).

Power Commission (FPC), the predecessor of the FERC, requiring a Connecticut electric utility to use accounting procedures mandated by the FPA despite the fact that the company's business was completely local in nature. The Court closely examined the provisions of the FPA empowering the FPC and found that the FPC overstepped its bounds by ordering the use of certain accounting procedures. The Court stated that through the FPA "Congress ... was trying to reconcile the claims of federal and of local authorities and to apportion federal and state jurisdiction over the industry." *Connecticut Light,* 324 U.S. at 531, 65 S.Ct. 749. Additionally, the Court was especially cognizant of the legislative history of the FPA in which Congress communicated its belief that the FPA did not give the FPC "jurisdiction over local rates." *Id.* at 525–28, 65 S.Ct. 749. The Court also cited a House of Representatives report which stated that "no jurisdiction is given over local distribution of electric energy, and the authority of States to fix local rates is not disturbed even in those cases where the energy is brought in from another state." *Id.* at 527, 65 S.Ct. 749 (citing H.R.Rep. No. 1318, 74th Cong., 1st Sess. 7, 8, 27 (1935)); *cf. Panhandle Eastern Pipe Line Co. v. Pub. Serv. Comm'n of Ind.,* 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947) (holding NGA extended federal regulation only to area which Supreme Court had held state could not reach and did not usurp state authority).

With this background in mind, we believe that the stranded-cost provisions are consistent with traditional state regulation of the local effects of state utilities for two reasons. First, the competitive transition charges are completely intrastate and have no real effect on interstate commerce. These charges are collected from consumers within the state by utilities located within the state, and they are tied to the transmission and distribution network wholly within this Commonwealth. Second, states continue to maintain the traditional police power to fix reasonable charges for the sale of electricity at the local level despite Congress's assumption of some regulatory authority over utilities. *Cf. Tracy,* 519 U.S. at —— n. 8, 117 S.Ct. at 820 n. 8 (discussing how all state regulation is not immune from Commerce Clause jurisprudence); *see also Camps Newfound/Owatonna v. Town of Harrison,* 520 U.S. 564, ——, 117 S.Ct. 1590, 1614, 137 L.Ed.2d 852 (1997) (proffering that *Tracy* creates a "public utilities" exception to the dormant commerce clause) (Scalia, J., dissenting). Had Pennsylvania continued its previous regulatory scheme, it would have undoubtedly permitted the recovery of stranded-costs through regulated rates, and there is no justification for disallowing these recoveries in a new competitive market.

The competitive transition charges are completely intrastate in nature, and any alleged effect on interstate commerce is completely illusory. The language of the statute detailing the assessment of these charges gives credence to this position: "every customer accessing the transmission or distribution network shall pay a competitive transition charge to the electric distribution company in whose certificated territory that customer is located." 66 Pa.C.S. § 2808(a). Thus, it is inescapably apparent that the charges are levied only on Pennsylvania residents and are directly connected to an undeniably intrastate concern (i.e., local electricity transmission and distribution networks). It escapes our collective logic that these charges could be deemed anything other than completely intrastate in nature.

Furthermore, the stranded-cost provisions are consistent with Pennsylvania's historical regulation of local utility rates, a power that appears to have been specifically apportioned to it by Congress. In this vein, the General Assembly of Pennsylvania has empowered the PUC to set "just and reasonable" rates for electricity and to generally oversee electric utilities in the interest of the public welfare. *See* 66 Pa.C.S. §§ 1301–14. This Court has stated, and the Pennsylvania Supreme Court has agreed, that "the Commission has an ongoing duty to protect the public from unreasonable rates while insuring that utility companies are permitted to charge rates sufficient to cover their costs and provide a reasonable rate of return." *Pennsylvania Pub. Util. Comm'n v. Philadelphia Elec. Co.,* 522 Pa. 338, 343–44, 561 A.2d 1224, 1226 (1989) (citing *Metropolitan*

*Edison v. Pennsylvania Pub. Util. Comm'n,* 62 Pa.Cmwlth. 460, 437 A.2d 76 (1981)) (citation omitted); *see also Popowsky v. Pennsylvania Pub. Util. Comm'n,* 683 A.2d 958, 961 (Pa.Cmwlth.1996) ("PUC has broad discretion in determining whether rates are reasonable"). The Competition Act in no way intended to diminish Pennsylvania's power to regulate local utility rates to ensure fair rates for the public and a reasonable return on investment for the utilities. In fact, the stranded-cost provisions specifically rely on a continuation of PUC oversight in setting of "just and reasonable" electricity rates to facilitate the move toward a competitive market.

In sum, IPL's argument is misplaced because the Competition Act's stranded-cost provisions affect only intrastate concerns and are consistent with Pennsylvania's ability to regulate local utility rates. Pennsylvania consumers pay them to Pennsylvania utilities in relation to transmission and distribution networks exclusively in Pennsylvania. Moreover, the stranded-cost provisions rely on the traditional state power, which appears to have been apportioned to the states by Congress, to set just and reasonable local utility rates.

### C.

We are also convinced that the implementation of stranded-cost recovery mechanisms in other forums is compelling evidence that the Commerce Clause should not be used to hinder Pennsylvania's experiment with competitive electric generation. The move toward competitive utility markets is a national trend,[10] and the recovery of stranded-costs is by no means isolated to the Competition Act. Those regulatory bodies, both federal and local, whose expertise has been relied on to facilitate the move toward open markets, seem to agree that these recoveries are essential. As such, we are compelled to defer to PUC's decision to model Pennsylvania's move toward competition after these other forums, and we see no justification for implicating the Commerce Clause in derailing this ambitious endeavor.

There is a hint of disingenuousness in IPL's attempt to implicate the Commerce Clause in this matter. The Commerce Clause was intended to serve as a shield against provincialism so as to promote a national economy. In the present case, IPL's alleged constitutional violation uses the Commerce Clause as a sword to attack the stranded-cost provisions in order to foster its own competitive advantage.[11] To accept IPL's position would undermine the history and purpose of stranded-cost recovery and the Competition Act.

The concept of stranded-cost recovery began in the natural gas industry and was soon applied to the electric industry. FERC ad-

---

**10.** It is worth noting that Pennsylvania is also exploring the deregulation of its gas utilities. *See* Rich Heidorn, Jr., *Gas Deregulation Could Be Next for Pa.'s Consumers,* Philadelphia Inquirer, Feb. 16, 1997, Section E, at 1.

**11.** IPL is asking us to strike down the stranded-cost provisions because it believes the provisions confer a benefit on PECO to the detriment of IPL. The stranded-cost recoveries represent recovery of the costs to which PECO and other Pennsylvania utilities would have been entitled had regulation continued. IPL is recovering these same costs from its monopoly franchise in Indiana. Disallowing PECO's stranded-cost recovery would surely benefit IPL in that PECO's financial position would be compromised, while IPL would be able to continue recovering similar costs under Indiana's regulatory scheme. *See* Ind.Code Ann. §§ 8–1–2–1–8–1–2–126 (Burns 1998) (detailing the powers of the Indiana Utility Regulatory Commission); Ind. Admin. Code tit.

170, rr. 4–1–1–4–6–23 (1998) (dealing with electric utility regulation).

It is worthy of note that the Indiana Court of Appeals has held in a decision involving IPL's request for a rate increase that the Commission's primary objective is to reach an overall result that is fair to utilities, and which will permit continuity of utility services on a sound financial basis. *L.S. Ayres & Co. v. Indianapolis Power & Light Co.,* 169 Ind.App. 652, 351 N.E.2d 814 (1976). In *L.S. Ayres,* the Indiana Court of Appeals stated that a:

> [P]ublic utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties.

169 Ind.App. at 660, 351 N.E.2d at 821. Likewise, overall fairness is at the foundation of PUC decision here.

dressed the concept in Order 636,[12] which required natural gas pipelines to open up their transportation services to customers who purchased their gas from a supplier other than the pipeline owner. The Order was intended to guarantee that there were equal interstate transportation services for all gas suppliers to allow for the "unbundling" of interstate natural gas sales. FERC was aware that that this "unbundling" procedure would burden the pipelines with stranded-costs.[13] As a result, FERC allowed for the recovery of "prudently incurred costs" through a process of petitioning FERC. *See* 57 Fed.Reg. 13,267, 13,309 (April 16, 1992); *see also United Distribution Companies v. F.E.R.C.*, 88 F.3d 1105 (D.C.Cir.1996) (rejecting challenge to FERC procedure for recovery of stranded-costs).

In turn, FERC also included stranded-cost recoveries in the context of the interstate electric industry in Order 888.[14] Order 888 required all utilities that owned, controlled, or operated facilities used in transmitting electricity in intrastate commerce to provide open access to their facilities to other utilities. The order was intended to facilitate the move from a "monopoly-regulated industry to one in which all sellers [could] compete on a fair basis and in which electricity [was] more competitively priced." 61 Fed.Reg. 21,540, 21,542 (May 10, 1996). FERC addressed stranded-costs in Order 888 and determined that it was necessary to allow "utilities to recover their legitimate, prudent and verifiable stranded-costs simultaneously with . . . requiring open access of transmission." *Id.* at 21,629.

In the present case, the Competition Act was the result of a year-long study by PUC into the viability of competitive electric generation. At the conclusion of this study,

PUC presented to the Governor a report detailing its proposed guidelines for opening electric generation to competition. In this report, PUC noted that "[d]ealing with stranded costs is one of the most difficult issues to be resolved in our efforts to move to a competitive electric industry." *Pennsylvania Public Utility Commission, Report and Recommendation to the Governor and General Assembly on Electric Competition*, Docket No. I–940032, p. 14 (July 3, 1996). PUC was understandably concerned with this aspect of the move toward competition, and it devoted a great deal of its report in setting guidelines for stranded-cost recovery. *See id.* p. 14–25.

It is not beyond peradventure to assume that PUC was well aware of the mechanisms being used in other forums to deal with the problems of stranded-costs. PUC's decision to recommend stranded-cost recoveries as part of the Competition Act was on all accounts a prudent and necessary element of the move toward competition, and at least one other state utility commission has come to the same conclusion in its transition to a competitive market.[15] As reflected in the Competition Act, the stranded-cost provisions are equitable and allow for a fair transition toward a competitive generation market. As reflected in the qualified rate order that is the subject of this appeal, we must defer to PUC's determination that these recoveries are warranted and just. *W.C. McQuaide, Inc. v. Pennsylvania Pub. Util. Comm'n*, 137 Pa.Cmwlth. 282, 585 A.2d 1151, 1154 (1991) ("We defer to the PUC on matters within its administrative ·expertise"). This Court lacks the expertise and resources to delve into the mechanics of PUC's order, and we have been

---

**12.** *Pipeline Service Obligations and Revisions to Regulations Governing Self–Implementing Transportation; and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, 57 Fed. Reg. 13, 267 (April 16, 1992).

**13.** Order 636 describes stranded-costs as "costs now incurred by pipelines in connection with their bundled sales services that cannot be directly allocated to customers of unbundled services." 57 Fed.Reg. at 13, 309.

**14.** *Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 61 Fed.Reg. 21,540 (May 10, 1996).

**15.** *See* Cal. Pub. Util.Code § 330(s) (West 1996) (stating that "[i]t is proper to allow electrical corporations an opportunity to continue to recover, over a reasonable transition period, those costs ... that may not be recoverable in market prices in a competitive generation market"); *see also* Cal. Pub.Code §§ 840–44 (West 1996) (relating to financing of transition costs).

presented no reason to believe that the order is improper.

In any event, we do not believe that the Commerce Clause was intended to be used to strike down endeavors like the one on which Pennsylvania has embarked. The words of Justice Brandeis are worth repeating to underscore this point:

> To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be frought [sic] with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.

*West Lynn Creamery*, 512 U.S. at 216, 114 S.Ct. 2205 (Rehnquist, C.J., dissenting) (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting)); *see also Connecticut Light*, 324 U.S. at 530, 65 S.Ct. 749, (stating that " 'insulated chambers of the states are still laboratories where many lessons in regulation may be learned by trial and error on a small scale without involving a whole national industry in every experiment' "). We need not go into great detail to emphasize the resources that have already been expended in pursuit of this endeavor, nor do we need to highlight all that would be lost if we were to accept IPL's argument. Suffice it to say, we believe that this experiment must proceed.

In summation, we find that the Competition Act does not implicate the Commerce Clause. The Competition Act, read in its entirety, is the antithesis of a statute that violates the Commerce Clause because it actually invites out-of-state competition in an area where states have been traditionally permitted to exclude such competition. This same tradition has allowed states to freely set local utility rates, and the stranded-cost provisions are consistent with this tradition. In addition, the need for stranded-cost recovery has been evidenced in other forums moving toward competition, and we feel that the Commerce Clause should not be used as an impediment to Pennsylvania's ambitious experiment with competition.

## IV.

■ We now briefly turn to addressing IPL's other arguments for the sake of thoroughness and to emphasize the implausibility of severing the stranded-cost provisions from the Competition Act as IPL desires. If we were to assume that the Competition Act implicates the Commerce Clause, the act must be viewed against a two-tiered test established by the United States Supreme Court. In this two-tiered test, a determination must first be made whether the act, either on its face or in its effect, discriminates against interstate commerce. If so, the act is "per se invalid, save in a narrow class of cases in which the [state] can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *C & A Carbone, Inc., v. Clarkstown*, 511 U.S. 383, 392, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). In the absence of direct discrimination, a determination must then be made whether the act has an incidental effect on interstate commerce. If there is an incidental effect on interstate commerce, then the statute is constitutional unless the "burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). We believe that the act would still survive if subjected to this two-tiered test.

### A.

■ We will begin by examining the stranded-cost provisions in relation to the second tier of the Constitutional test because we are convinced that the Competition Act as a whole does not discriminate in purpose or effect. The basis for our belief was set out in detail above, but is worth repeating. We believe that the true purpose of the act is to promote competition. We also believe that the stranded-cost provisions are an integral part of this move toward competition and are in no way a surreptitious attempt to discriminate against interstate commerce. Moreover, the Competition Act and the stranded-cost recoveries have no discriminatory effect on interstate commerce because the recoveries are purely intrastate concerns and afford no unfair advantage to local utilities. There-

fore, we believe that, at most, the Competition Act and the stranded-cost provisions have an incidental effect on interstate commerce, and that they are constitutional unless the "burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." *Id.*

IPL contends that by allowing local utilities to recover these stranded-costs, Pennsylvania has placed a burden on interstate commerce that is clearly excessive in relation to the putative local benefit. In addition, IPL argues that these local interests could be promoted as well with a lesser impact on interstate commerce. We disagree. The local concerns encompassed by the stranded-cost recoveries are profound and clearly outweigh any alleged burden on interstate commerce. IPL has also failed to present this Court with a reasonable alternative to the stranded-cost recoveries that would impact interstate commerce less.[16]

We believe that Pennsylvania's interest in regulating the retail sales of electric utilities, as discussed in section III. B. above, is enough to uphold the stranded-cost provisions under the Commerce Clause. However, there are many other local interests that are sufficient, independently, to uphold the act. An exhaustive examination of all the other local concerns that support the constitutionality of the stranded-cost provisions is unnecessary, as we believe that highlighting a handful of these concerns is sufficient to illustrate the shortcomings of IPL's argument.

To begin, we believe that the need to insure the future viability of Pennsylvania's electric utilities in the period of transition toward competition is of preeminent local concern. PECO will be entitled to recover over $5 billion in stranded-costs during the transition toward competition. These sums would have been recovered under the prior regulated scheme to afford PECO a fair re-turn on its investments. Without these recoveries there is no guarantee that PECO will remain a viable entity. There can be no doubt that in general there is a strong need for viable local electric utilities. With respect to the present case, there are two needs which are of particular importance: first, the need to maintain the transmission and distribution networks located in Pennsylvania, and second, the need to have reliable service for all Pennsylvania consumers at all times.

As part of the move toward competition, the General Assembly believed that "the electric industry restructuring should ensure the reliability of the interconnected electric system by maintaining the efficiency of the transmission and distribution system." 66 Pa.C.S. § 2808(2). To this end, the General Assembly included language in the Competition Act that directly relates the recovery of stranded-costs to this transmission and distribution system. *See* 66 Pa.C.S. § 2808(2). Without stranded-cost recoveries the transmission and distribution networks maintained by PECO would be placed in peril. At the end of the day, there may not be any network for IPL to use in competing with PECO and other utilities if stranded-cost recoveries were disallowed. In this event, any benefit IPL could gain from competition would be completely undermined. More important, electric service in Pennsylvania altogether could be jeopardized. These stranded-cost recoveries are essential to insuring that Pennsylvania has local utilities that can maintain the transmission and distribution networks so electricity, including that generated by IPL, can reach Pennsylvania consumers and so competition can proceed.

Another related concern is the need to insure that Pennsylvania consumers have viable energy companies in the event that out-of-state electric generation companies cannot supply all the energy needs of all classes of

---

16. The only alternative that IPL presents this Court is to require PECO to divest itself of all its generating facilities in exchange for recovery of its stranded-costs. Requiring utilities to divest themselves of their generating facilities would not only raise the issue of an unconstitutional taking, but would also jeopardize Pennsylvania's electric utility service. It is foreseeable that many local electric utilities in Pennsylvania will be entitled to stranded-cost recoveries. If they were all required to divest themselves of their generating facilities, Pennsylvania could be left with little or no local electric generation capacity. This is hardly a reasonable alternative.

Pennsylvania consumers. Pennsylvania utilities will still serve as the provider of last resort to bridge the gap when out-of-state suppliers do not have enough electricity to service Pennsylvania consumers. 66 Pa.C.S. § 2802(16). In addition, local utilities will still have a responsibility to serve low-income segments of Pennsylvania's population, which obviously is not as profitable as servicing the population at large. 66 Pa.C.S. § 2802(10). On the other hand, out-of-state utilities, like IPL, enter the state under their own volition and they can just as easily leave to sell their energy somewhere more profitable. The additional responsibilities placed on PECO, like the stranded-cost recoveries, are a by-product of past regulation and are a continuing local concern in the new competitive market.

The need for viable local utilities is vital for the future of the Commonwealth of Pennsylvania, and any burden placed on interstate commerce by the recoveries needed to insure the continuation of these local utilities is not clearly excessive. The success of the transition toward competition is highly dependent on solid transmission and distribution networks, which must be maintained by local utilities. In addition, these local utilities are burdened with obligations not shared with out-of-state competitors to serve as the guarantor of universal electric service. We cannot envision many more important local concerns than the need for viable local electric companies, and we fail to see how IPL's alleged burden is clearly excessive in relation to the need for viable local utilities.[17]

Another local concern that cannot be denied is the need to guarantee that electric utilities have the necessary funds to decommission nuclear power plants and to remove spent radioactive fuel from these plants. Previously, these costs were collected in rates over the life of the plant so that all ratepayers paid an equal share, but this will be impossible in an open market. These expenses are just one example of costs that will become stranded in the move toward competition that was of concern to the General Assembly. *See* 66 Pa.C.S. § 2808(c)(1). It goes without saying that Pennsylvania has an important local interest in insuring that local utilities are financially able to decommission plants and to remove the radioactive materials stored there. Again, we are not convinced that IPL has been subjected to a burden in clear excess of this local concern.

A last local concern is seen in Pennsylvania's obligation to "resolve certain transitional issues in a manner that is fair to ... electric utilities, investors, and the employees of electric utilities." 66 Pa.C.S. § 2802(8). We need not elaborate in great detail what we perceive as the devastating repercussions that utilities, their stockholders, and their employees will suffer if utilities are denied stranded-cost recoveries. Denying PECO over $5 billion, to which it is entitled, will surely place the company in a compromised financial position at the very time when it becomes subject to competition. In sum, Pennsylvania has an obligation to be fair in its experiment with competition, and any burden caused by the Commonwealth's desire to foster this local concern is not clearly excessive.

### B.

Finally, we turn to addressing IPL's arguments that the stranded-cost provisions are on their face and in effect discriminatory, and that the provisions are severable from the act as a whole. We chose to address these arguments together because we feel that if we were to accept IPL's position that the stranded-cost provisions are in purpose and/or effect discriminatory, we would inevitably conclude that the entire Competition Act would have to be struck down. We feel that it is implausible to sever the stranded-cost provisions from the act as whole because the General Assembly never envisioned competition on the terms that IPL is suggesting. As such, examining these arguments together brings to the fore the contradictory nature of IPL's position because it would lead us to

---

17. Without going into prolonged discussion we would like to note that we believe that this local concern is of such a profound magnitude that it could possibly survive the per se unconstitutional test of *C & Carbone.* We believe that any pur-

ported "discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *New Energy,* 486 U.S. at 274, 108 S.Ct. 1803.

eradicate the very thing that gives IPL standing before this Court.

Accepting IPL's argument that the stranded-cost provisions are discriminatory in purpose and effect, despite the compelling evidence otherwise, is outcome determinative. The provisions would be per se invalid unless the state can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest. *C & A Carbone,* 511 U.S. 383, 114 S.Ct. 1677. The burden that this would place on the state would be very difficult to overcome, and we do not think for our purposes here that it would be productive to discuss whether the state has other means to advance its local interest. Therefore, if we assume that the provisions are purposely and/or effectively discriminatory, it is also safe to assume that we would be required to strike down the stranded-cost provisions as unconstitutional.

■ IPL would then have us sever the stranded-cost provisions. IPL bases its severability argument on the severability clause contained in the act, *See* Act of Dec. 3, 1996, P.L. 802, No.138, § 5, and the public policy favoring severability. *Commonwealth, Dep't of Education v. First School,* 471 Pa. 471, 370 A.2d 702 (1977). In addition, IPL argues that the issue of severability is a matter of statutory construction and legislative intent. Although we agree with the way IPL has framed the issue, we believe that severing the stranded-cost provisions would mutilate the Competition Act and would be contrary to the intent of the General Assembly. Severing the provisions would also jeopardize the transition toward competition to everyone's detriment and would place Pennsylvania's local utilities in a precarious and unfair financial position.

■ Even when a statute contains a severability clause, this Court is empowered to nullify an entire statute when severing the challenged provisions would result in a departure from the legislative intent of the statute or when the challenged provision are integral to the statute as a whole.[18] We believe this case presents a situation where the provisions are not severable for both reasons. Dealing with stranded-cost recoveries was regarded as one of the most difficult tasks in moving toward competition by PUC. In addition, the General Assembly recognized the difficulty and importance of stranded-cost recoveries and empowered PUC "to determine the level of transition or stranded-cost for each utility" and to allow "recovery of an appropriate amount of such costs in accordance with the standards established" under the act. 66 Pa C.S. § 2802(16). Moreover, the General Assembly went to great lengths to set certain guidelines for the recovery of stranded-costs, and it tied stranded-cost recoveries to the local utilities' continuing obligation to maintain transmission and distribution networks. 66 Pa.C.S. § 2808. Severing these provisions is in our minds implausible since they were regarded as so essential to the transition toward competition envisioned by the General Assembly and are so interwoven with the local utilities' continuing obligation to maintain the transmission and distribution networks.

The General Assembly was aware that the Competition Act was an experiment that would occasion some transitional problems. To address these problems, the General Assembly included provisions in that act that would insure that those local concerns discussed above (i.e., viable electric companies, nuclear decommissioning costs, and fairness) were protected. We are certain that the General Assembly would not have chosen to proceed with the move toward competition if it would have jeopardized electric service in Pennsylvania as IPL would have us do.

---

**18.** The Statutory Construction Act provides that provisions of a statute shall be severable unless: [T]he court finds that the valid provisions of the statute are essentially and inseparably connected with, and so depended upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone are incomplete and are incapable of being executed in accordance with the legislative intent 1 Pa.C.S. § 1925; *see also West Shore School Dist. v. Pennsylvania Labor Relations Bd.,* 131 Pa.Cmwlth. 476, 570 A.2d 1354, 1359 (1990), *aff'd,* 534 Pa. 164, 626 A.2d 1131 (1993) (discussing deference to severability clause unless legislative intent is destroyed or provisions are integral).

In conclusion, we hold that the Competition Act does not involve the Commerce Clause because the act promotes competition on equitable terms and because the stranded-cost provisions are consistent with traditional state regulation of local electric rates. Also, the use of stranded-cost recovery is part of the national trend toward competitive utility markets, and the Commerce Clause should not serve as a detriment to Pennsylvania's ambitious experiment. In addition, the Competition Act and the stranded-cost provisions would survive an application of the Supreme Court's Commerce Clause jurisprudence because any effect that the act or provisions have on interstate commerce is incidental and supported by strong, if not compelling, local concerns.

Accordingly, the order of the PUC is affirmed.

### ORDER

AND NOW, this 7th day of May, 1998, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is affirmed.