**HATFIELD TOWNSHIP MUNICIPAL AUTHORITY, Petitioner**

**v.**

**Pennsylvania PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 9, 2003.

Decided June 4, 2004.

Reargument Denied Aug. 2, 2004.

Kevin J. Moody, Harrisburg, for petitioner.

Shane M. Rooney, Harrisburg, for respondent.

Thomas P. Gadsden, Philadelphia, for intervenor, PECO Energy Co.

BEFORE: SMITH–RIBNER, Judge, and COHN, Judge, and MIRARCHI, Senior Judge.

OPINION BY Judge SMITH–RIBNER.

The Hatfield Township Municipal Authority (Hatfield) petitions for review of an order of the Pennsylvania Public Utility Commission (PUC) that denied Hatfield's exceptions to the initial decision of an Administrative Law Judge (ALJ) and dismissed Hatfield's complaint against the

PECO Energy Company (PECO). Hatfield states the following questions: whether the PUC's order resulted in unlawful discrimination by denying Hatfield the same 8.71% discount rate that the PUC approved for the only other customers for which stranded cost buyouts were calculated; whether the PUC erred by capriciously disregarding irrefutable evidence; whether substantial evidence existed to support the PUC's decision; and whether the appropriate remedy is placing Hatfield in the same position it would have been in but for PECO's actions.

I

In December 1996 the General Assembly adopted the Electricity Generation Customer Choice and Competition Act (Competition Act), 66 Pa.C.S. §§ 2801—2812, to introduce competition into the generation aspect of the electric utility business by requiring electric utilities to unbundle generation from their other rates and services. Each electric utility company, now defined as an "electric distribution company" was required to offer open access over its transmission and distribution system to competitive suppliers, and each was required to file a restructuring plan to bring itself into compliance with the Competition Act and with PUC regulations. The legislature recognized that electric utilities undertook long-term investments in generation facilities, which "stranded costs" might not be recoverable in a competitive market.[1] Section 2808 of the Competition Act, 66 Pa.C.S. § 2808, provided for a competitive transition charge (CTC) and an intangible transition charge (ITC) (relating to transition bonds issued under a PUC qualified rate order) to customers as means of recovering these costs gradually in monthly payments over an extended transition period.

PECO filed its restructuring plan with the PUC on April 1, 1997, and various parties contested the plan. On April 29, 1998, the parties filed a Joint Petition for Full Settlement of PECO's restructuring plan and related appeals, for a qualified rate order and for transfer of generation assets (Restructuring Settlement). The PUC approved the settlement in *Application of PECO Energy Company for Approval of its Restructuring Plan Under Section 2806 of the Public Utility Code, et al.* (Nos. R–00973953 and P–00971265, final order filed May 14, 1998). Paragraph 25 of the Restructuring Settlement provided:

> All Rate HT industrial customers, LILR customers, and Rule 4.6 and EER customers shall have the right to pay all applicable CTC/ITC charges in one lump sum. For customers exercising this option, PECO and the customers will negotiate a mutually acceptable lump sum using the customer's most recent 12 months of demand and energy usage as billing determinants, unless such demand and energy usage will not be representative of the customer's likely demand and energy consumption during the CTC/ITC recovery period (in which case representative values will be used), applied to the CTC/ITC charges for the entire CTC/ITC recovery period, *discounted using PECO's after-tax cost of*

---

1. Section 2803 of the Competition Act, 66 Pa.C.S. § 2803, defines "Transition or stranded costs" in part as follows:
   An electric utility's known and measurable net electric generation-related costs, determined on a net present value basis over the life of the asset or liability as part of its restructuring plan, which traditionally would be recoverable under a regulated environment but which may not be recoverable in a competitive electric generation market and which the commission determines will remain following mitigation by the electric utility.

*capital.* Exercise of the rights in this paragraph and paragraph 26 below shall impose no additional burdens on any other customer classes. Prior to agreeing to such lump sum payment, PECO shall submit for Commission approval a proposal for determining how the lump sum payment of CTC/ITC will affect reconciliation. (Emphasis added.)

This CTC/ITC buyout provision was incorporated into PECO's electric tariff.[2]

In June 1999 the Philadelphia Suburban Water Company (PSW), a large Rate HT customer, first proposed a buyout of its CTC/ITC obligations. The parties negotiated over a period of eighteen months, and they eventually agreed on a buyout amount that was calculated using 8.71% as the discount rate to determine the lump sum amount. The PSW buyout was filed, and the PUC approved it by an order entered January 11, 2001. In March 2001 Hatfield inquired about a buyout, and in June 2001 PECO informed Hatfield that the appropriate discount rate for its buyout was 3.93%. On December 10, 2001, Hatfield filed a complaint with the PUC alleging that use of the 3.93% discount rate was in conflict with PECO's tariff and would result in an overcollection of CTC/ITC obligations. It requested that the PUC order PECO to use 8.71% as the discount rate and to use July 19, 2001 as a hypothetical "effective date" for determining the buyout amount.

ALJ Charles E. Rainey, Jr. received written testimony and conducted a hearing on October 2, 2002. In an initial decision of February 24, 2003, ALJ Rainey dismissed Hatfield's complaint. The ALJ held that Hatfield as the moving party had the burden of proof, and he found that the 8.71% after-tax cost of capital used as the discount rate in the PSW proceeding was derived from testimony of PECO's rate of return witness in the restructuring proceeding.[3] The ALJ noted that PECO's after-tax cost of capital reflected in its financial statement filings (Forms 10Q and 10K) with the Securities and Exchange Commission (SEC) for March 2001 was 3.93% and for March 2002 was 4.19%. The ALJ observed that the parties agreed that the case turned upon whether the requirement in Paragraph 25 to discount using PECO's after-tax cost of capital meant that the 8.71% figure should be used in the calculation of all buyouts, as Hatfield contended, or whether PECO's present after-tax cost of capital should be used.

Hatfield argued that 8.71% was used by PECO in its restructuring filing as the after-tax cost of capital to determine the present value of the stream of revenue from PECO's generating plants, a function similar to valuing a stranded-cost discount; that PECO used 8.71% to support CTC rates proposed in an August 1997 Partial Settlement, which was not approved; and that PECO used 8.71% to evaluate Full

---

**2.** PECO's Tariff Electric No. 3, First Revised Page No. 30 provides:

   As an alternative means of collecting the CTC, individual customers and PECO Energy may mutually agree to a payment schedule that fully collects the same present value without bypass by the customer or overcollection by PECO Energy. For purposes of determining such a payment schedule, the Company will follow the provisions in paragraph 25 of the Joint Petition for Full Settlement.

**3.** The ALJ found also that in regard to PECO's application to merge with Unicom Corporation, the PUC approved an agreement between PECO and the National Railroad Passenger Corporation (Amtrak) giving Amtrak an option to buy out its CTC/ITC obligations on any of eight specified dates between October 1, 2000 and July 1, 2002, with the lump sum payment amount calculated using an after-tax cost of capital figure of 8.71%. Amtrak, however, did not exercise the option.

Settlement proposals and the PSW and Amtrak buyout amounts, even though PECO's actual after-tax cost of capital at the time was lower, namely, 5.94%. PECO responded that the parties deliberately refrained from designating a particular discount rate because they knew that PECO's after-tax cost of capital could and would change during the stranded-cost recovery period. PECO's witness Stephen R. Xander explained that when the parties agreed to a CTC/ITC buyout discount using PECO's after-tax cost of capital, they also agreed to numerous settlement provisions that would, when implemented, change that cost of capital, including the issuance of $4 billion in new transition bonds and the transfer of billions of dollars of generating assets and associated capitalization (equity) to an affiliate company. Further, Alan B. Cohn of PECO testified that the PUC and the parties knew that actions PECO could take would lower its cost of capital.

The ALJ was persuaded by the testimony from Xander and Cohn. He concluded that the disputed phrase was meant to refer to PECO's present after-tax cost of capital, which varies over time, and that evidence indicated that the parties intended buyouts to be calculated using discount rates that reflected PECO's opportunity cost when the buyout was negotiated. Moreover, the figure 8.71% does not appear in Paragraph 25, making it more likely that after-tax cost of capital referred to *present* after-tax cost of capital rather than to 8.71%. Also PECO's witnesses participated in the negotiations, and Hatfield's sole witness did not.

Regarding the fact that PECO used 8.71% for the PSW and Amtrak negotiations, the ALJ accepted PECO's explanation that 8.71% was taken from its witness' testimony in the restructuring proceedings and was used as a "proxy" present after-

tax cost of capital because of uncertainties surrounding its securitization initiative and its then-pending corporate reorganization. The ALJ noted Xander's testimony that three important things changed between the earlier negotiations and those for Hatfield: first, in January 2001 PECO completed its corporate restructuring and in March 2001 the first post-restructuring balance sheets were filed with the SEC, i.e., a single set of financial documents that fully captured the effects of the transition bonds and the transfer of generation assets; second, the PUC's reservation of a right to investigate the reasonableness of any charges under the Restructuring Settlement seemed to PECO to add a new element of risk regarding CTC/ITC buyout amounts; and third, PECO received an influx of CTC/ITC buyout requests in the Spring and Summer of 2001, primarily from clients of E. Martin Shane (Hatfield's witness), and it knew from its experience that its current procedures needed to be improved. The ALJ stated that he only had to determine whether Hatfield proved that Paragraph 25 means that 8.71% must be used to discount all CTC/ITC obligations, regardless of time of request.

On consideration of Hatfield's exceptions and PECO's reply exceptions, the PUC noted that the Restructuring Settlement was approved pursuant to Section 2808(b) of the Competition Act, 66 Pa.C.S. § 2808(b), which provides in part that transition charges shall be collected during a period not to exceed nine years unless the utility and the customer agree on a different method or unless the PUC for good cause shown orders an alternative period. The PUC agreed with the ALJ that had the Restructuring Settlement intended 8.71% to be the discount factor to be used throughout the transition period, it would have said so, and it concluded that PECO's previous use of that figure was reasonable in light of pending events sur-

rounding restructuring and capital events that had been mandated but not yet consummated. In this case PECO properly used an appropriate method to determine its after-tax cost of capital, i.e., its SEC filings, which was consistent with the Competition Act and the Restructuring Settlement.

The PUC rejected Hatfield's exception which challenged the ALJ's credibility and evidentiary weight determinations regarding PECO's witnesses, noting that it was within the purview of the ALJ to weigh all of the evidence. The PUC agreed that PECO's witnesses were credible, and it concluded that they certainly supported PECO's case; more to the point, the PUC concluded that Hatfield's witness did not establish by a preponderance of the evidence that Paragraph 25 was consistent with Hatfield's view. Regarding Hatfield's assertion that the ALJ's determination necessarily results in discrimination by treating similarly situated customers differently and that it would nullify the right of customers such as Hatfield to buy out their CTC/ITC obligations, the PUC stated that the premise of Hatfield's argument was in error. Hatfield's claimed harm was a function of the timing of its requested buyout. Had Hatfield pursued its request when PECO was applying an 8.71% discount factor, Hatfield would have had the benefit of that factor. The PUC adopted the ALJ's initial decision to the extent that it was consistent with the PUC's opinion and dismissed Hatfield's complaint.

## II

Hatfield first argues that the PUC's order results in unlawful discrimination by denying Hatfield the same 8.71% discount rate that the PUC approved for calculating the stranded cost buyout amounts for PSW and Amtrak. It asserts that PECO's full recovery of its $5.26 billion in stranded costs and 10.75% rate of return is guaranteed no matter what discount rate is used.[4] Hatfield quotes from Section 1304 of the Public Utility Code, 66 Pa.C.S. § 1304: "No public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage." Hatfield contends that it suffers prejudice if it is denied the 8.71% discount rate because the use of a much lower discount rate makes a buyout "economically unattractive" even for customers such as Hatfield, with low costs of capital and predictable future use patterns. Hatfield stresses that in its request for approval of the PSW buyout, PECO stated that the buyout calculations were "straightforward and in full accordance with Paragraph 25 of the Restructuring Settlement." Hatfield Ex. 11, Attachment p. 2, R.R. 307a.

The record shows, Hatfield asserts, that the real reason for the change was that PECO knew of Shane's business development activity when it began receiving his buyout requests, and PECO decided to put an end to buyout requests by adjusting the discount rate, although none of its "manifest actions" before that indicated that any rate other than 8.71% was proper. Hatfield states that the participation of PECO's witnesses in the Restructuring

4. Hatfield cites PECO's answer to a written question posed by Hatfield, stating that recovery of the $5.26 billion and the revenue requirement of 10.75% remain the same regardless of the discount rate used. Hatfield Ex. 3, R.R. 297a. The response also stated, however, that when different discount rates are used for different customers, the value of the buyouts will change, and the resulting balance of unamortized transition costs, to which the 10.75% revenue requirement rate of return applies, will also change. *Id.*

Settlement negotiations undermines PECO's current position, because if PECO always understood the discount rate to be a variable rate, which would change up and down, then it should have applied the after-tax cost of capital from its most recent SEC filings earlier. Hatfield disputes PECO's position that uncertainties concerning the completion of PECO's restructuring and refinancing events prevented it from using current after-tax cost of capital as those events were implemented, stating that by June of 1999 PECO had spent nearly all of the bond proceeds to reacquire high cost debt and to reduce its cost of capital and that the Restructuring Settlement always anticipated that generation assets and liabilities would be transferred out of PECO.

Hatfield's second argument is closely related. It contends that the PUC erred by capriciously disregarding "irrefutable evidence" contrary to its decision, citing principles that an adjudication is not in accordance with law if it is determined that a reasonable mind would not make the same decision based upon the evidence, *Fraternal Order of Police v. Pennsylvania Labor Relations Board,* 557 Pa. 586, 735 A.2d 96 (1999), or if the agency deliberately disregarded competent evidence that a person of ordinary intelligence could not possibly have avoided in reaching its result, *Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe),* 571 Pa. 189, 812 A.2d 478 (2002). Hatfield essentially repeats the points set forth above concerning the PSW and Amtrak buyout negotiations, the PUC's approval, PECO's after-tax cost of capital according to SEC filings, PECO's right to receive the full CTC/ITC amounts and the timing of purchases with the $3.95 billion in transition bonds.[5] Hatfield argues that PECO's after-tax cost of capital did in fact vary as PECO anticipated, which figure was readily available from its SEC filings, and that nothing in Paragraph 25 of the Restructuring Settlement required PECO to wait for consummation of its corporate restructuring and financing before using its then current after-tax cost of capital.

■ The PUC first emphasizes that the subject matter of this dispute, i.e., the interpretation of a tariff, lies within the administrative expertise of the PUC. *Aronson v. Pennsylvania Public Utility Commission,* 740 A.2d 1208 (Pa.Cmwlth. 1999). *See also Popowsky v. Pennsylvania Public Utility,* 550 Pa. 449, 706 A.2d 1197 (1997). The Court has held that the subject of stranded costs and their recovery is a matter within the expertise of the PUC, in a case disposing of a challenge by an out-of-state supplier of electricity to the stranded cost recovery mechanisms incorporated in PECO's Restructuring Settlement. *Indianapolis Power & Light Co. v. Pennsylvania Public Utility Commission,* 711 A.2d 1071 (Pa.Cmwlth.1998). The PUC refers to the fact that Hatfield had the burden of proof to show that PECO's application of its tariff was inconsistent with the Restructuring Settlement and that 8.71% was the proper discount figure.

The PUC acknowledges that under *Leon E. Wintermyer, Inc.* review of administrative decisions includes a component of capricious disregard of the evidence (when raised by the petitioner), but it points out that this is to be applied in conjunction with substantial evidence review. Contrary to Hatfield's assertion that its evi-

---

**5.** Hatfield cites to a calculation in its Reply Brief before the PUC of the amount of bonds that had not been used as of June 30, 1999 to reduce PECO's cost of capital according to the SEC filing for the quarter ending that date, which calculation includes a mathematical error, asserting that $750,000,000 is 1.9% of $3,950,000,000, rather than 19%. R.R. 481a.

dence was "irrefutable," the PUC notes that PECO's witnesses responded to the testimony of Shane and that the ALJ reviewed the evidence in detail and found PECO's witnesses to be more persuasive on a number of points. The fact that 8.71% was used as the discount rates in earlier buyout agreements does not mean that the PUC's refusal to apply it here amounts to capricious disregard of the evidence. Rather, the PUC asserts that its determination was supported by substantial evidence. It refers to the ALJ's conclusion that in the context of the Restructuring Settlement, it was apparent that the phrase after-tax cost of capital was intended to mean the current after-tax cost, and it notes his reliance on the fact that 8.71% was not used in Paragraph 25 and his determination that PECO's witnesses were more likely to know what was intended in Restructuring Settlement language. The PUC maintains that locking in an 8.71% discount rate for the duration of the transition period would not reflect actual oppor-

tunity costs at any particular time and would overstate the present value of stranded cost payments.[6]

The final section of the PUC's brief addresses Hatfield's Section 1304 claims.[7] The PUC contends that this Section prohibits only unreasonable discrimination or preferences in rates; a mere difference in rates does not violate this section. The PUC is required by PECO's tariff and by Section 2808(f) of the Public Utility Code, 66 Pa.C.S. § 2808(f), to guard against overrecovery or underrecovery of the CTC. Use of the present after-tax cost of capital is reasonable and protects other customers from having to make up any difference from using a figure that does not reflect economic conditions at the time of buyout.

The Court fully agrees that applying a current after-tax cost of capital at the time of negotiation of a CTC/ITC buyout does not result in unlawful discrimination among customers. The ALJ and the PUC in the proper exercise of their expertise concluded that such an application is re-

---

6. The absence of the figure 8.71% from Paragraph 25 of the Restructuring Settlement is an "irrefutable fact." Although Hatfield's witness stated in his written Surrebuttal Testimony of September 20, 2002, p. 21, R.R. 100a, that 8.71% was not a different number from what had been used in the restructuring proceedings and therefore did not need to be stated expressly in Paragraph 25, the PUC was not bound to accept this interpretation. The PUC quotes Cohn's explanation that the discount rate is the opportunity cost for the buyout funds, which varies:

In essence, the question is what PECO can earn on that cash. In other words, typically a discount rate is set at the opportunity cost for those funds. If the discount rate accurately mirrors what PECO can earn on the cash, once in hand, then the lump sum payment will leave PECO in the same position as if the lump sum payment had not occurred.

Rebuttal Testimony of Alan B. Cohn, August 12, 2002, p. 9, R.R. 68a.

In its reply brief Hatfield asserts that PECO's arguments are internally inconsistent

in part because the opportunity cost is tied to when the buyout money is actually received, whereas rates were proposed in negotiations with PSW and others based on when the buyout request was made. However, the PUC's opinion referred to the representation of PECO in its Reply Exceptions that in the course of this proceeding the original 3.93% after-tax cost of capital from March 2001 filings was adjusted to 4.27% based upon updated capital cost data.

7. First the PUC asserts that this argument has been waived because Hatfield did not raise Section 1304 before the PUC. The PUC points out that Section 1304 prohibits "unreasonable preference or advantage" or "unreasonable differences as to rates[.]" However, Hatfield's arguments based on claims of unlawful discrimination, by which Hatfield clearly meant an unreasonable disadvantage to it, were sufficient to raise and preserve this issue. Further, the PUC's ruling essentially addressed that issue and resolved it.

quired by Paragraph 25 of the Restructuring Settlement. Hatfield failed to sustain its burden of proof to establish that 8.71% was intended by the Restructuring Settlement to be applied to all future CTC/ITC buyouts.[8] Thus the Court concludes that the PUC did not err in adopting the initial decision of the ALJ determining that Hatfield was not entitled under the Restructuring Settlement and PECO's tariff to a discount rate of 8.71% for its proposed CTC/ITC buyout. The Court need not consider Hatfield's further assertion that a decision in its favor should incorporate a buyout as of July 2001 and the responses of the PUC and PECO. The order of the PUC is affirmed.

Judge COHN dissents.

### ORDER

AND NOW, this 4th day of June, 2004, the order of the Pennsylvania Public Utility Commission is affirmed.

---

**8.** Hatfield continues to assert in its main brief and in its reply brief that a discount rate of 8.71% is proper because it is related to the 10.75% rate of return that PECO was assured on a portion of its stranded costs. The Court notes that in cross-examination in regard to Shane's testimony that 8.71% was "associated" with the 10.75% figure, he agreed that 8.71% was not an after-tax derivative of 10.75%, and in fact that 8.71% was not a derivative of 10.75% in any other sense. N.T. at pp. 67–68, R.R. 207a–208a.